UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 1:21-cv-11901-WGY

JUDITH PRINZO, on behalf of herself            )
and all other employees similarly situated,    )
                                               )
                  Plaintiff                     )
                                               )
            v.                                   )
                                               )
HANNAFORD BROS. CO., LLC,                       )
                                               )
                  Defendant.                     )

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

## Table of Contents

Facts ..................................................................................................................................4

Argument ........................................................................................................................10

  1.  Class certification standard. ......................................................................................10

  2.  This case meets all of the criteria for class actions. ................................................11

    A. Numerosity ...........................................................................................................11

    B. Commonality and Predominance ..........................................................................12

    C. Typicality .............................................................................................................17

    D. Adequacy .............................................................................................................17

    E. Superiority ...........................................................................................................18

Conclusion .....................................................................................................................20

Exhibit 1:      Hannaford Interrogatory Answers
Exhibit 2:      Deposition of Daniel Singer
Exhibit 3:      Deposition of Heather Trodella
Exhibit 4:      Salaried Pay Ranges, Depo. Ex. 47 (REDACTED)
Exhibit 5:      Second Declaration of Kendall Gedeon
Exhibit 6:      Hiring Toolkit, Depo. Ex. 38
Exhibit 7:      Hourly Pay Scales, Depo. Ex. 45 (REDACTED)
Exhibit 8:      Onboarding Modules Training Aids, Depo. Ex. 48
Exhibit 9:      Deposition of Kimberly Ayre
Exhibit 10:    Bakery Standard Practice Training Aids, Depo. Ex. 22 (Excerpt)
Exhibit 11:    Deposition of Caleb Field
Exhibit 12:    Fixed Labor Standards, Depo. Ex. 56
Exhibit 13:    Declaration of Kendall Gedeon
Exhibit 14:    Standard Practice Training Aid – Kronos, Depo. Ex. 59
Exhibit 15:    Sample Volume Hours Reports (REDACTED)
Exhibit 16:    Sample MQ Fixed Hours Report
Exhibit 17:    Deposition of Chelsea Nelson
Exhibit 18:    Training Guide, Bakery Sales Associate, Depo. Ex. 21
Exhibit 19:    Deposition of Jeremy Stevens
Exhibit 20:    Deposition of Michael Beaulieu
Exhibit 21:    Scheduling Report, Depo. Ex. 58
Exhibit 22:    Hours Over/Under Goal (HOG/HUG) Reports, Depo. Ex. 62 (REDACTED)
Exhibit 23:    Retail Pay Scales – Massachusetts, Hannaford_122197-99 (REDACTED)
Exhibit 24:    Affidavit of Stephen Churchill
Exhibit 25:    Affidavit of Benjamin Knox Steffans

This case is brought by Judith Prinzo, a former bakery department manager in Massachusetts. Ms. Prinzo alleges that Hannaford wrongly classifies its fresh department managers[1] as exempt from overtime. As other courts have recognized, such a challenge presents "about the most perfect questions for class treatment." *Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 373 (S.D.N.Y. 2007). Indeed, Hannaford *itself* has conceded that uniform treatment of this group is appropriate, because it treats managers as a unified group when classifying them as exempt from overtime. It would be "disingenuous for [Hannaford], on one hand, to collectively and generally decide that all [department managers] are exempt from overtime compensation without any individualized inquiry, while on the other hand, claiming that plaintiffs cannot proceed collectively to challenge the exemption." *Nerland v. Caribou Coffee Co.*, 564 F. Supp. 2d 1010, 1022-24 (D. Minn. 2007). *See also Lyons v. Citizens Financial Group, Inc.*, 2012 WL 5499878, at *2 (D. Mass. Nov. 9, 2012) (certifying overtime misclassification class and noting "[i]n characterizing the work of the [managers] as substantially similar … the plaintiff is simply following the defendants' lead").

For purposes of class certification, the key point is that department managers have enough in common that the nature of their "primary duty" is the same, regardless of their individual store or department. As a Massachusetts court held when certifying a class of allegedly misclassified employees, the "question of whether the [employees'] 'primary duty' [qualifies for an exemption] is not answered by looking to the slight deviations among employees in the way they perform their job function, but by focusing on 'the *principal, main,*

---

[1] Including deli managers, bakery managers, produce managers, seafood managers, meat market managers, or combinations thereof.

*major or most important duty* that the employee performs.'" *Goldberg v. EF Education First, Inc.*, 2017 WL 4400028, at *8 (Mass. Super. Ct. June 29, 2017) (emphasis in original), *quoting* 29 C.F.R. § 541.700(a).

Hannaford will argue that department managers are "executive" or "administrative" employees. The evidence, however, tells a very different story. Department managers spend most of their time performing the same kinds of "grunt" work performed by the hourly employees with whom they work, side-by-side. Any so-called management duties require comparatively little time, are controlled by highly specific procedures and guidelines, and are subject to oversight and monitoring. Hannaford classifies department managers as exempt not because those employees do much in the way of managing, but primarily to control costs by having salaried managers provide what amounts to free extra labor, labor that otherwise would be performed by associates who are being paid by the hour.

For these reasons, and as discussed in more detail below, Ms. Prinzo respectfully requests that this Court certify a class of Massachusetts fresh department managers, appoint her as named representative, and appoint Fair Work, P.C. and Steffans Legal PLLC as class counsel.

## Facts

There are at least 116 department managers in the proposed class. (Defendant's Responses and Objections to Plaintiff's First Set of Interrogatories [1] at 5-6).[2] Managers are commonly scheduled to work 45 hours per week, meaning that they consistently work overtime. (Deposition of Daniel Singer ("Singer Depo.") [2] 37:15-24; Deposition of Heather Trodella

---

[2] The numbers in brackets refer to the exhibits attached to this motion. Pursuant to Hannaford's request for confidentiality, some of those exhibits are being filed with this motion in redacted form, as noted in the table of contents above. The parties will be filing a joint motion to file unredacted versions of those exhibits under seal.

("Trodella Depo.") [3] 32:1-7). But because they are classified as exempt and paid a salary as opposed to hourly (*see, e.g.*, Depo. Ex. 47 [4]), they receive no overtime pay.

A.      **Uniform and Classwide Standards and Policies as to Job Duties**

Hannaford maintains comprehensive and uniform corporate policies and procedures that define the duties of department managers. Those comprehensive policies and procedures demonstrate, among other things, that the so-called "management" duties of the potential class members, regardless of department or store, are the same. For example, Hannaford's departmental "standard practice training aids" demonstrate both that all fresh department managers perform the same types of "management" tasks and that they perform those tasks in the same way without regard to department or store. (Second Declaration of Kendall Gedeon ("2d Gedeon Decl.") [5] ¶¶ 3-5).

More generally, Hannaford has centralized and highly detailed policies and procedures for all of its store operations, including for duties performed by members of the proposed class. For example, there are specific guidelines about, among other things, how all employees should interview job applicants (*see, e.g.*, Depo. Ex. 38 [6]); how human resources employees, store managers, or others should set employee pay (*see, e.g.*, Depo. Ex. 45 [7]); how trainers should train employees (*see, e.g.*, Depo. Ex. 48 [8]); and how all employees in a department (from associates up to department managers) should perform each of their job duties, from cleaning floors to scheduling employees (*see, e.g.*, Deposition of Kim Ayre ("Ayre Depo.") [9] 37:1-45:6; Depo. Ex. 22 Excerpt [10]).

The specific tasks performed by everyone in a department, from hourly employees to managers, as well as how long those tasks take, are set forth in great detail in so-called "labor standards." As to the comprehensiveness of these "labor standards," according to Hannaford's

Manager of Retail Scheduling Caleb Field, "*any* task, job, [or] action that requires work at a Hannaford store has a labor standard associated with it." (Deposition of Caleb Field ("Field Depo.") [11] 7:17-22, 10:7-22) (emphasis added). Hannaford's goal in developing these labor standards is "to capture *every activity* performed by positions at Hannaford." (Field Depo. [11] 19:19-22) (emphasis added). The standards are developed by engineers based on standard training practices and observations of employees performing work. (Field Depo. [11] 12:9-17, 14:1-20, 15:4-16:6). They are developed for all positions in a store (other than the store manager), *including department managers*. (Field Depo. [11] 14:21-15:3). Labor standards have job categories associated with them, which reflect who is responsible or qualified to perform any specific task. (Field Depo. [11] 23:5-24:14; Depo. Ex. 56 [12]). Once labor standards have been developed, a department manager cannot unilaterally change them, even if they believe the standard is inaccurate; any change must be based on further studies performed by labor standard engineers. (Field Depo. [11] 25:11-26:3). The accuracy of labor standards is critical, because they are used to schedule labor. (Field Depo. [11] 17:2-10).

There are three types of labor standards: fixed, variable, and monthly/quarterly. (Field Depo. [11] 12:24-13:6). **Fixed labor standards** are tasks that are performed without regard to store volume, such as how long it takes to clean a fryer. (Field Depo. [11] 13:7-12; Depo. Ex. 56 [12]). The amount of time necessary to perform fixed tasks that are classified as "manager" tasks is consistent across stores and departments in Massachusetts, amounting to about 10 hours per week. (Declaration of Kendall Gedeon [13] ¶¶ 2-3). Many of those "manager" tasks, such as scheduling or checking time & attendance,[3] are ones that non-exempt assistant managers are

---

[3] Scheduling and checking time and attendance takes close 2 ½ - 3 hours each week. (Depo. Ex. 56 [12]).

trained to perform, in very specific detail. (Depo. Ex. 59 [14]). Other tasks, like attending store leadership meetings or ordering bakery supplies (Depo. Ex. 56 [12]), are routine tasks that do not require any supervisory or management skills.

**Variable labor standards** are tasks that take certain amounts of time depending on customer volume or demand – for example, the labor standards provide that a cake takes 8.5 minutes to prepare. Assuming there is an expected demand of 10 cakes, the expected total labor would be 85 minutes (8.5 x 10). (Field Depo. [11] 13:13-16, 18:5-20). There is only one variable labor standard for department managers: "general supervision," which varies based only on the number of customers. (Sample Volume Hours Reports [15]). For Ms. Prinzo's former department, for example, the amount of time allocated to that standard is typically around five hours per week. (*Id*.).

**Monthly/quarterly labor standards** are tasks performed on fixed but non-weekly schedules, like inventories or employee appraisals. (Field Depo. [11] 13:17-21). Those labor standards confirm how little time managers spend on certain supervisory tasks. (Sample MQ Fixed Activities [16]). For example, annual performance reviews take 30-60 minutes per year for each associate, with quarterly progress reviews taking only 30 minutes per quarter for each associate. (Id.). As another example, "action planning" takes only 30 minutes per quarter. (*Id*.).

Hannaford previously claimed that managers do things like hiring, training, or taking disciplinary action that are not captured in labor standards. (*See, e.g*., ECF No. 21-2 at ¶ 8). That claim, however, is contradicted by evidence that Hannaford's labor standards capture all work done by department managers, as noted above. In addition, to the extent managers are involved with those tasks from time to time, their actions are controlled by detailed policies and procedures, and are subject to control and oversight. For example, a store's human resources

staff will prescreen potential new hires and determine their starting pay, subject to approval by the store manager (not the department manager). (Deposition of Chelsea Nelson ("Nelson Depo.") [17] 38:7-39:14; 40:1-8; 64:6-10). Training is conducted in a highly structured and pre-determined manner. (Ayre Depo. [9] 11:8-14:3; Depo. Ex. 21 [18]). And department managers do not have authority to terminate employees, a process that requires multiple layers of review and approval. (Trodella Depo. [3] 35:5-15; Nelson Depo. [17] 44:17-45:14). Finally, there is no evidence that these kinds of tasks – hiring or taking disciplinary action, for example – take any significant amount of time or that the process for completing these tasks varies from store to store.

### B.     Uniform and Classwide Policies as to Scheduling

Schedules are prepared weekly and on an automated basis. (Field Depo. [11] 29:5-10; Depo. Ex. 59 [14]). The scheduling system provides expected volume information, which department managers can adjust (subject to review),[4] and the system then generates a schedule (assigning specific employees to specific shifts of specific duration on specific days) based on the labor standards and associate availability. (Deposition of Jeremy Stevens ("Stevens Depo.") [19] 15:14-17:22; Field Depo. [11] 29:11-32:22; Depo. Ex. 59 [14]). After schedules are generated, department managers can change shift assignments between associates, but final schedules are subject to review and require final approval by store management. (Singer Depo. [2] 46:13-24; Depo. Ex. 56 [12]). This scheduling process means, among other things, that excluding important, time-consuming, or regular tasks from labor standards would result in insufficient time to get those tasks done.

---

[4] Over the course of a week, expected volumes are adjusted to reflect actual volumes, which changes the amount of labor "earned" for a department. (Deposition of Michael Beaulieu ("Beaulieu Depo.") [20] 47:22-48:17; Depo. Ex. 59 [14]).

This scheduling process occurs throughout Hannaford on a common platform, called Kronos, and the platform allows for detailed tracking and reporting. For example, data from Kronos can be used to demonstrate the extent to which managers perform non-managerial tasks. In one illustrative week, for example, Kronos data show that Ms. Prinzo was expected to perform at least 31.5 hours of "associate" tasks – i.e., tasks that can be performed by hourly employees. (Depo. Ex. 58 [21]). She also was expected to perform "manager" tasks that could be performed by non-exempt employees, like an assistant manager. (Depo. Ex. 58 [21]).

Department managers are monitored on a weekly basis to measure whether they accurately scheduled for their department based on labor standards, with the biggest deviations from the projected hours reviewed by more senior management. (Beaulieu Depo. [20] 28:21-29:2, 34:9-35:20, 36:20-37:24; Depo. Ex. 62 [22]). Overtime amounts are also monitored on a weekly basis. (Beaulieu Depo. [20] 41:1-10; Depo. Ex. 62 [22]). Because managers are not paid overtime, the labor they perform does not impact overtime amounts. (Beaulieu Depo. [20] 16:13-22, 38:12-39:21). This setup creates a natural incentive for department managers to take on additional tasks in order to avoid having bad overtime reports.

C.      **Uniform and Classwide Standards as to Compensation**

There also is common evidence about what department managers are paid relative to hourly employees, including pay scales for both department managers and hourly employees. (Depo. Ex. 47 [4]; Hannaford Retail Hourly Pay Scale for Massachusetts, Effective 12/27/20, Hannaford_000122197 [23]). That evidence can be used to show that the salaries paid to department managers was not significantly different (and potentially lower) than what they would have been paid as a lower-level hourly employee. For example, Ms. Prinzo's last salary as of her termination in January 2021 was $60,584.55. (Docket No. 1:21-cv-10968-WGY, ECF No.

27-1, at 3). At that time, the pay range for a full-time assistant bakery manager (a non-exempt position) was $17.42 to $27.22 per hour. (Hannaford_000122197 [23]). For a 45-hour work week (and Ms. Prinzo generally worked more hours), that would equate to weekly pay (with overtime) ranging from $827.45 to $1,292.95, or annual pay of $43,027.40 to $67,233.40, meaning that Ms. Prinzo's salary was potentially less than her pay would have been if she had been in a lower-level non-exempt position.

## Argument

### 1.    Class certification standard

Under Fed. R. Civ. P. 23, Ms. Prinzo must show that (1) the class is so numerous that joinder of all members is impractical (numerosity), (2) there are questions of law or fact common to the class (commonality), (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality), and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy). Fed. R. Civ. P. 23(a). She must also satisfy the two additional requirements of Rule 23(b) – i.e., that (1) questions of law or fact common to the members of the class predominate over any questions affecting only individual members (predominance), and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy (superiority). Fed. R. Civ. P. 23(b)(3). As discussed below, all of these requirements are satisfied.

In exercising their discretion at the class certification stage, courts look to the underlying purposes of class actions. As the Supreme Court recognized long ago, a "principal purpose" of class actions is to advance "the efficiency and economy of litigation." *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 553 (1974). By joining multiple potential suits into a single one that shares common questions, class proceedings are "designed to avoid…unnecessary filing of repetitious

papers and motions." *Id*. at 550. Moreover, class actions serve an important role in deterring statutory violations. *Mullins v. Direct Dig., LLC*, 795 F.3d 654, 668 (7th Cir. 2015) ("deterring…corporate wrongdoing" is an "important policy objective of class actions"); *Diakos v. HSS Sys., LLC*, 137 F. Supp. 3d 1300, 1307 (S.D. Fla. 2015) ("Class-action lawsuits were designed to be effective tools for deterring wrongdoing."); *Barkouras v. Hecker*, 2006 WL 3544585, at *4 (D.N.J. Dec. 8, 2006) ("leaving [companies] unpunished" for statutory violations was "exactly the kind of result Congress intended to avoid through the creation of the class action form"). And, finally, class actions promote consistency, including for the benefit of defendants like Hannaford. *Bell v. PNC Bank, N.A*., 800 F.3d 360, 379 (7th Cir. 2015) (class certification benefits defendants by providing a single proceeding in which to adjudicate claims that will bind all class members); *Gunnells v. Healthplan Servs., Inc*., 348 F.3d 417, 427 (4th Cir. 2003) ("Class certification…promotes consistency of results, giving defendants the benefit of finality and repose."). Indeed, if Hannaford is confident in its classification of fresh department managers, it should welcome class certification to obtain a uniform determination about the propriety of that classification.

## 2. This case meets all of the criteria for class actions.

### A. Numerosity

Rule 23(a)(1) requires that a class be "so numerous that joinder . . . is impracticable." Fed. R. Civ. P. 23(a)(1). The First Circuit has recognized that this is a "low threshold." *Garcia-Rubiera v. Calderon*, 570 F.3d 443, 460 (1st Cir. 2009). While no minimum number is required, the numerosity requirement generally is satisfied when the putative class exceeds 40 members. *Id*. (citation omitted). Here, there are over 100 members of the putative class, easily exceeding the numerosity threshold.

### B. Commonality and Predominance

Rule 23(a)(2) requires that "questions of law or fact" be "common to the class." Fed. R. Civ. P. 23(a)(2). Commonality requires the identification of an issue that by its nature "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes v. Wal-Mart Stores, Inc.*, 564 U.S. 338, 350 (2011). A single common issue is sufficient to establish commonality. *Id.* at 359 ("We quite agree that for purposes of Rule 23(a)(2) even a single common question will do….") (internal quotation marks, brackets, and citations omitted). Because Ms. Prinzo seeks certification under Rule 23(b)(3), which requires her to establish the more demanding element of predominance, there is no reason here to examine commonality separately. *See* 1 Newberg on Class Actions § 3:27 (5th ed.) ("Due to the similarities between the two requirements . . . courts will often treat the application of [commonality] and [predominance]) together. If the [predominance] requirement is met, the [commonality] prerequisite is automatically satisfied") (collecting cases).

Predominance "does not require an entire universe of common issues," only "'a sufficient constellation' of them." *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 70 (D. Mass. 2005), *quoting Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000). Significantly, "[a] 'single, central issue' as to the defendant's conduct vis-a-vis class members can satisfy the predominance requirement even when other elements of the claim require individualized proof." *Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21, 26 (D. Mass. 2003), *quoting In re Prudential Ins. Co. of Am. Sales Pracs.*, 148 F.3d 283, 314 (3d Cir. 1998).

Liability in this case turns on whether Hannaford's fresh department managers are exempt from overtime under Massachusetts law. Employers are required to pay an overtime

premium for any hours over forty in a work week, subject to 20 enumerated exemptions, including for "executive" and "administrative" employees. M.G.L. c. 151, § 1A. Those exemptions must be construed narrowly, and Hannaford has the burden of proving that department managers fall within one of the exemptions. *See, e.g., Arias-Villano v. Chang & Sons Enterprises,* 481 Mass. 625, 628-29 (2019); *Goodrow v. Lane Bryant, Inc*., 432 Mass. 165, 170 (2000); *Reich v. Newspapers of New England, Inc*., 44 F.3d 1060, 1070 (1st Cir. 1995).

In this case, the exempt status of department managers turns on their "primary duty." *See, e.g., Marzuq v. Cadete Enterprises, Inc*., 807 F.3d 431, 439 (1st Cir. 2015) (focusing on employees' "primary duty" when examining exempt status). An employee's "primary duty" means "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). The "major emphasis" when determining a primary duty is "*on the character of the employee's job as a whole*." *Id*. (emphasis added). Relevant factors include, among other things, "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id*.

For the *administrative* exemption, Hannaford bears the burden of showing that (1) the "primary duty" of department managers was "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and (2) this duty included "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a).

For the *executive* exemption, Hannaford bears the burden of showing that (1) the "primary duty" of department managers "is management of the enterprise in which the employee

13

is employed or of a customarily recognized department or subdivision thereof," (2) department managers "customarily and regularly direct[] the work of two or more other employees," *and* (3) department managers have "the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a).

Because exemptions turn on a position's "primary duty," and because that term focuses on the character of a job "as a whole," employers like Hannaford regularly make categorical determinations of exempt status *by position*, not by the specific tasks that any individual employee performs on a day-to-day basis. And for precisely the same reason, courts have recognized that those categorical determinations are well suited to being challenged on a class basis, particularly where job duties are well defined, as they are here. *See, e.g., Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 160 (S.D.N.Y. 2008) ("Where, as here, there is evidence that the duties of the job are largely defined by comprehensive corporate procedures and policies, district courts have routinely certified classes of employees challenging their classification as exempt, despite arguments about 'individualized' differences in job responsibilities.").[5] *See also Casias v. Distribution Management Corporation, Inc*., 2014 WL 12710236, at *13 (D.N.M., 2014) ("in deciding whether an employer's uniform exemption policy is supported by common evidence…, one of the relevant inquiries is whether…the 'employer exercised some level of

---

[5] The district court cited the following authority as support for its conclusion: "*Krzesniak v. Cendant Corp.,* No. C 05-05156, 2007 WL 1795703, at *3 (N.D.Cal. June 20, 2007) (improper classification of branch managers at car rental chain); *Alba v. Papa John's USA, Inc.,* No. CV 05-7487, 2007 WL 953849, at *1 (C.D.Cal. Feb. 7, 2007) (improper classification of store managers at pizza delivery chain); *Torres v. Gristede's Operating Corp.,* No. 04 Civ. 3316, 2006 WL 2819730, at *2 (S.D.N.Y. Sept. 29, 2006) (improper classification of store co-managers and department managers at supermarket chain); *Whiteway v. FedEx Kinko's Office and Print Services, Inc.,* No. C 05-2320, 2006 WL 2642528, at *1 (N.D. Cal. Sept. 14, 2006) (improper classification of "center managers" at shipping and print services retail chain); *Tierno v. Rite Aid Corp.,* No. C 05-02520, 2006 WL 2535056, at *1 (N.D.Cal. Aug. 31, 2006) (improper classification of store managers at drug store chain); *Goldman v. Radioshack Corp.,* No. Civ.A. 03-0032, 2005 WL 1124172, at *4 (E.D.Pa. May 9, 2005) (improper classification of store managers at electronics chain)." *Id*. at 160-61.

centralized control in the form of standardized hierarchy, standardized corporate policies and procedures governing employees, uniform training programs, and other factors susceptible to common proof.'") (citation omitted).

Each of the factors relevant to determining the "primary duty" of fresh department managers will turn on common evidence. Indeed, common evidence – including, for example, Hannaford's detailed training protocols, "standard practice" materials, labor standards, scheduling systems, standardized pay ranges, and Kronos data – will provide common answers about what department managers do, how they do it, and how long it takes them to do it. That information, in turn, can be used to provide common answers to the questions that determine an employee's primary duty, including the relative importance of tasks performed by the employee, the amount of time spent performing different tasks, the employee's level of supervision by others, and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. 29 C.F.R. § 541.700(a). As a result, common issues will predominate in this case.

The First Circuit's decision in *Marzuq* is illustrative. In that case, the Court concluded that it is significant, for purposes of determining an alleged "executive" employee's exempt status, whether the employee spent most of their time performing non-exempt tasks. 807 F.3d at 439 ("The difference between performing nonexempt work most of the time—i.e., 90 percent— and possibly less than half the time—i.e., 'more than 40 percent'—could be significant in evaluating whether a manager is able to perform supervisory and nonexempt tasks concurrently."). Here, Ms. Prinzo will predominantly use common evidence – e.g., labor standards, Kronos data, etc. – to show that fresh department managers spend "most of the time" performing non-exempt tasks. Likewise, the Court noted that if, "contrary to their job

descriptions, managers could not prioritize their supervisory duties because 'quality Customer Service' demanded that they regularly perform tasks ordinarily assigned to hourly employees, a factfinder could reasonably conclude that plaintiffs' exempt and nonexempt duties were equally important to the successful operation of their restaurants." *Id*. at 441. Again, Ms. Prinzo will use predominantly common evidence to show that Hannaford's uniform policies and procedures "demanded that [all department managers] regularly perform tasks ordinarily assigned to hourly employees." Finally, the Court noted that evidence of close supervision of an alleged manager could support a finding that the manager was not an exempt "executive" employee. *Id*. at 443-44. Here, too, Ms. Prinzo will predominantly use common evidence to prove the extent to which all fresh department managers were subject to control and monitoring.

The principal issue that will need to be resolved on an individual basis relates to the specific amount of each class member's damages. But the need to calculate damages on an individual basis is routine in wage-and-hour class actions and does not preclude class certification. *DaSilva v. Border Transfer of MA, Inc*., 296 F.Supp.3d 389, 406 (D. Mass. 2017). *See also Smilow v. Southwestern Bell Mobile Sys. Inc.,* 323 F.3d 32, 40 (1st Cir. 2003) ("Where, as here, common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain."). The Supreme Court recently reaffirmed this principle in *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016), stating, "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Id*. at 453-54 (citation omitted).

### C.  Typicality

Typicality is "'not highly demanding' because 'the claims only need to share the same

essential characteristics, and need not be identical.'" *Payne,* 216 F.R.D. at 24-25, *quoting* 5

*Moore's General Practice* § 23.24[4]. "For purposes of demonstrating typicality, '[a] sufficient

nexus is established if the claims or defenses of the class and the class representative arise from

the same event or pattern or practice and are based on the same legal theory.'" *In re Relafen*

*Antitrust Litig.*, 231 F.R.D. at 69, *quoting In re Terazosin Hydrochloride Antitrust Litig.*, 220

F.R.D. 672, 686 (S.D. Fla. 2004).

Here, the claim of all class members is the same, relying on the same legal theory.

Indeed, any fresh department manager would be typical in this case, because the challenged

misclassification affected every such manager. *See, e.g., McLaughlin v. Liberty Mut. Life Ins.*

*Co.*, 224 F.R.D. 304, 309-310 (D.Mass. 2004) (typicality satisfied where plaintiffs "were all

employed by the defendant" and their claims arose "out of the same policies and wrongful

conduct of the [d]efendant, and [were] based on the same legal theories"); *Key v. Gillette Co.*, 90

F.R.D. 606, 609 (D. Mass. 1981) ("'When the named representative's own claim transcends the

individual and implicates a discrete employment practice, the . . . typicality requirements of Fed.

R. Civ. P. 23(a) may be satisfied and class treatment may be appropriate.'"), *quoting DeGrace v.*

*Rumsfeld*, 614 F.2d 796, 811 (1st Cir. 1980).

### D.  Adequacy

Rule 23(a)(4) mandates that the "representative parties will fairly and adequately protect

the interests of the class." Fed. R. Civ. P. 23(a)(4). Two factors must be satisfied to fulfill this

prerequisite: "(1) the absence of potential conflict between the named plaintiff and the class

members and (2) that counsel chosen by the representative parties is qualified, experienced and

able to vigorously conduct the proposed litigation." *Adair v. Sorenson*, 134 F.R.D. 13, 18 (D. Mass. 1991), *quoting Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985) (internal quotations omitted).

Ms. Prinzo has no actual or potential conflicts with other class members. Her pursuit of this claim will advance the interests of every class member, because all of those class members have been harmed by Hannaford's misclassification policy. As another district court noted in a similar case, "[t]here is no conflict because the named plaintiff[] and the putative class share an interest in recovering wages lost as a result of misclassification." *DaSilva*, 296 F. Supp. 3d at 405. That Ms. Prinzo is up to the task of representing the class is demonstrated by the fact that she has pursued this case diligently on behalf of her fellow department managers – for example, she has responded to discovery, has assisted counsel repeatedly, and has sat through a lengthy deposition. With respect to adequacy of representation, Ms. Prinzo's counsel are well-qualified and experienced in employment law and class action litigation. (Churchill Aff. [24]; Steffans Aff. [25]).

### E.  Superiority

Courts have recognized that "policy considerations unique to the employment context make class adjudication superior." *DaSilva*, 296 F. Supp. 3d at 406. As this Court noted when addressing superiority in another wage and hour case, "[b]oth the United States Supreme Court and the Massachusetts Supreme Judicial Court have expressed a strong preference for rendering decisions on the classification of employees on class wide basis." *De Giovanni v. Jani-King Intern., Inc*., 262 F.R.D. 71, 85-86 (D. Mass. 2009), *citing Athol Daily News v. Board of Review of the Div. of Employment & Training,* 439 Mass. 171, 181 (2003) ("[C]riteria based on the factual circumstances of each individual worker, rather than on the nature of the services

performed, would have the anomalous result of inconsistent status determinations with respect to workers performing identical services for the same company.") *and Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 327 (1992) (determination of employment status "generally turns on factual variables within an employer's knowledge, thus permitting categorical judgments about the 'employee' status of claimants with similar job descriptions").

A class action is also a superior means of adjudicating the case for purposes of deterrence. The practical reality is that in the absence of class treatment few (if any) other managers will have the resources, knowledge, or courage to enforce their rights under the Massachusetts wage laws. Whether that failure to come forward arises from fear of retaliation[6] or other reasons is immaterial. The important consideration is that a lack of enforcement will undermine the important public policies that the Massachusetts legislature sought to advance when enacting the wage statutes at issue in this case. The importance of vigorous enforcement is demonstrated, among other ways, by provisions that expressly allow aggrieved employees to bring wage claims on behalf of all others similarly situated. M.G.L. c. 151, § 1B. As Massachusetts courts have recognized, this type of statutory provision grants a "substantive right to bring a class proceeding" and plainly favors class certification. *Machado v. System4 LLC*, 465 Mass. 508, 514-15 ("Wage Act provides for a substantive right to bring a class proceeding [and] very legitimate policy rationales underl[ie] the Legislature's decision to provide for class proceedings under the Wage Act").

---

[6] Risk of reprisal by an employer is well recognized as weighing in favor of certification. *Overka v. American Airlines, Inc.*, 265 F.R.D. 14, 17, 2010 WL 517407, at *8 (D.Mass. Feb. 4, 2010) ("[C]lass adjudication is superior in the employment context because fear of employer retaliation may have a chilling effect on employees bringing claims on an individual basis"). Indeed, one court has explained that fear of employer retaliation is "a very important concern" because the "nature of the economic dependency involved in the employment relationship is inherently inhibiting." *O'Brien v. Encotech Const. Servs., Inc.*, 203 F.R.D. 346, 350 (N.D. Ill. 2001).

## Conclusion

For these reasons, Ms. Prinzo respectfully requests that this Court:

(1)     Certify a class that includes all individuals who worked as fresh department

managers for Hannaford in Massachusetts between January 12, 2018[7] and the

present, or such other classes or sub-classes that the Court deems appropriate;

(2)     Appoint Plaintiff Judith Prinzo as class representative;

(3)     Appoint Fair Work, P.C. and Steffans Legal PLLC as class counsel; and

(4)     Make such other orders as are just and necessary to protect the interests of the

class.

> JUDITH PRINZO, on behalf of herself
> and all other employees similarly situated,
>
>
> /s/ *Stephen S. Churchill*
> Stephen Churchill, BBO #564158
> FAIR WORK, P.C.
> 192 South Street, Suite 450
> Boston, MA 02111
> Tel.     (617) 607-3260
> Fax.     (617) 488-2261
> steve@fairworklaw.com
>
> Benjamin Knox Steffans, BBO #568535
> Steffans Legal PLLC
> 10 Wendell Ave. Ext. Suite 208
> Pittsfield, MA 01201
> (413) 418-4176
> bsteffans@steffanslegal.com

Dated: July 29, 2022

---

[7] The complaint was filed on April 28, 2021, which ordinarily would make the limitations period reach back to April 28, 2018, but that period is subject to 106 days of tolling based on orders issued by the SJC during the COVID-19 pandemic, making the limitations period reach back to January 12, 2018. *Shaw's Supermarkets, Inc. v. Melendez*, 488 Mass. 338, 342 (2021).

## **CERTIFICATE OF SERVICE**

I certify that on this date I served a copy of the foregoing document, through the ECF system, on counsel for the Defendant.


Dated: July 29, 2022                                    _/s/ Stephen Churchill_
                                                        Stephen Churchill