# In the Matter of:

*Judith Prinzo vs*

*Hannaford Bros. Co. LLC*

## Heather Trodella

## June 15, 2022

68 Commercial Wharf • Boston, MA 02110
888.825.3376 - 617.399.0130
Global Coverage
court-reporting.com



Page 2

```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
 2
 3
 4
 5   _____
 6   JUDITH PRINZO on behalf of herself
 7   and all other employees similarly
 8   situated,
 9        Plaintiff,
10   V.                 C.A. NO. 1:21-CV-11901-WGY
11   HANNAFORD BROS. CO., LLC,
12        Defendant.
     _____
13
14
15
16
17            DEPOSITION OF:
18            HEATHER TRODELLA
19            CONDUCTED REMOTELY
20            BIDDEFORD, MAINE
21   WEDNESDAY, JUNE 15TH, 2022 AT 12:59 P.M., EST
22
23
24
```

Page 2

```
 1              A P P E A R A N C E S
 2
 3  ON BEHALF OF THE PLAINTIFF, JUDITH PRINZO, ET AL.:
 4       STEPHEN CHURCHILL
 5       FAIR WORK, P.C.
 6       192 SOUTH STREET, SUITE 450
 7       BOSTON, MASSACHUSETTS 02111
 8       TELEPHONE NO. (617) 607-3262
 9       E-MAIL: STEVE@FAIRWORKLAW.COM
10
11  ON BEHALF OF THE DEFENDANT, HANNAFORD BROS. CO., LLC:
12       RYAN A. GLASGOW
13       HUNTON ANDREWS KURTH, LLP
14       RIVERFRONT PLAZA, EAST TOWER
15       951 EAST BYRD STREET
16       RICHMOND, VIRGINIA 23219
17       TELEPHONE NO. (804) 788-8200
18       E-MAIL: RGLASGOW@HUNTONAK.COM
19
20  ALSO PRESENT:
21       ANNE CUNNINGHAM, IN-HOUSE COUNSEL, HANNAFORD BROS. CO.
22       NATHANIEL JONES, HUNTON ANDREWS KURTH, LLP
23
24
```

Page 3

```
 1                 I N D E X
 2                                         PAGE
 3  DIRECT EXAMINATION BY MR. CHURCHILL       6
 4
 5
 6
 7  _____
 8
 9            S T I P U L A T I O N S
10
11       The deposition of HEATHER TRODELLA was taken remotely via
12  Zoom from Biddeford, Maine on Wednesday, the 15th day of
13  June, 2022 at 12:59 p.m., said deposition was taken pursuant to
14  Notice for use in accordance with United States District Court
15  Rules of Civil Procedure.
16
17       It is agreed that Kelley K. Bohan, being a Notary Public
18  and Court Reporter for the State of Massachusetts, may swear the
19  witness remotely and that the reading and signing of the
20  completed transcript by the witness is not waived.
21
22
23
24
```

Page 4

```
 1              P R O C E E D I N G S
 2       COURT REPORTER:  We are on the record.  This is Kelley
 3  Bohan.  I am a court reporter, and I am a notary public in the
 4  Commonwealth of Massachusetts.
 5       This deposition is being taken remotely.  This witness
 6  is appearing remotely from Biddeford, Maine.
 7       The attorneys participating in this proceeding
 8  acknowledge their understanding that I am not physically present
 9  in the proceeding room, nor am I physically present with the
10  witness and that I will be reporting this proceeding remotely.
11  They further acknowledge that, in lieu of an oath administered
12  in person, the witness will verbally declare her testimony in
13  this matter under the pains and penalties of perjury.  The
14  parties and their counsel consent to this arrangement and waive
15  any objections to this manner of proceeding.
16       Please indicate your agreement by stating your name
17  and your agreement on the record, after which I will swear in
18  the witness and we may begin.
19       MR. CHURCHILL:  This is Steve Churchill representing
20  the plaintiff, and I agree.
21       MR. GLASGOW:  This is Ryan Glasgow representing the
22  defendant, and we agree as well.
23
24
```

Case 1:21-cv-11901-WGY   Document 27-3   Filed 07/29/22   Page 3 of 11

Judith Prinzo vs                                                    Heather Trodella
Hannaford Bros. Co. LLC                                             June 15, 2022

Page 5

1    _____
2              HEATHER TRODELLA
3    having been duly sworn, was examined
4    and testifies as follows:
5
6              DIRECT EXAMINATION
7  BY MR. CHURCHILL:
8    Q.  Good afternoon, Ms. Trodella.
9    A.  Hi.
10   Q.  Can you please state your full name?
11   A.  My name is Heather Trodella.
12       MR. CHURCHILL:  And actually before we get going just
13 to put on this transcript, the parties have agreed to reserve
14 all objections, except as to form and motions to strike; we
15 agreed to waive any notarization requirements; and that the
16 witness can read and sign the transcript within 30 days of
17 receipt?
18       MR. GLASGOW:  We agree.
19 BY MR. CHURCHILL:
20   Q.  Sorry for that interruption.  What is your date of
21 birth?
22   A.  2-7-85.
23   Q.  Have you been deposed before?
24   A.  No.

Page 6

1    Q.  Okay, just a few quick ground rules.  If I ask you a
2  question you don't understand, then you can ask me for a
3  clarification.  Okay?
4    A.  Uh-huh -- yes.
5    Q.  Secondly, related to how you just responded, it's
6  important that any responses be verbal as opposed to nods,
7  gestures, uh-huhs, uh-uhs, because that's not reflected
8  accurately necessarily on the transcript.  Okay?
9    A.  Yes.
10   Q.  Likewise, please wait until I'm done with my question
11 until you answer, that helps the court reporter get down a clean
12 record, and it also gives your attorney a chance to object if he
13 chooses to do so.  Okay?
14   A.  Yes.
15   Q.  And, finally, if you need to take a break for any
16 reason, that's fine, just say the word and we can take a break.
17 The only rule that we follow is that if there's a question
18 pending, you should go ahead and answer the question and then
19 we'll take a break.  Okay?
20   A.  All right.
21   Q.  All right.  What is your educational background
22 starting with college?
23   A.  College, I've got a four-year degree with -- at the
24 University of Maine.

Page 7

1    Q.  All right.  When did you graduate?
2    A.  2007.
3    Q.  And you currently work for Hannaford; is that right?
4    A.  Correct.
5    Q.  First of all, what was your degree in?
6    A.  Journalism with a concentration in advertising.
7    Q.  All right.  When did you first start working for
8  Hannaford?
9    A.  2000.
10   Q.  Okay.  What was your first job there?
11   A.  I was a service clerk.
12   Q.  Okay.  And when did you first starting working --
13       Well, you currently work full-time; is that right?
14   A.  Correct.
15   Q.  And did you work for Hannaford while you were in
16 college?
17   A.  Yes.
18   Q.  Part-time I take it?
19   A.  Yes.
20   Q.  Okay.  After you graduated, did you start working for
21 Hannaford full-time?
22   A.  Yes.
23   Q.  What was your first position with Hannaford after you
24 graduated?

Page 8

1    A.  It was a position called the retail manager trainee
2  program.
3    Q.  Okay.  And were you participating in the training?
4    A.  I was a trainee.
5    Q.  Okay.  And how long did that program last?
6    A.  About 18 months.
7    Q.  Okay.  And what's the purpose of that training as you
8  understand it?
9    A.  Yep, as I understood it and what was shared with me,
10 the purpose of that program, slash, training was information to
11 learn about each department prior to being placed as an
12 assistant store manager.
13   Q.  Okay.  Where did the training happen?
14   A.  Multiple different stores.
15   Q.  And after you completed the training, what was your
16 next position?
17   A.  I was placed as an assistant store manager.
18   Q.  How long did you work as an assistant store manager?
19   A.  Approximately five years.
20   Q.  How many different stores?
21   A.  I believe it was about four.
22   Q.  Okay.  What state or states were the stores in?
23   A.  The stores were primarily in Maine.
24   Q.  Okay.  Did you work in any stores outside of Maine?

Page 9

1    A. At that time?
2    Q. During those four years.
3    A. Uh, I did.
4    Q. Okay. What other states?
5    A. New Hampshire.
6    Q. Okay. Any other states?
7    A. No, I don't believe so.
8    Q. And after those four years during which you were --
9    oh, five years, I'm sorry -- when you were working as an
10   assistant store manager, what was your next position?
11   A. My next position was a store manager.
12   Q. Okay. How long did you serve as a store manager?
13   A. Approximately two years.
14   Q. Okay. And how many different stores did you manage?
15   A. Two.
16   Q. Okay. Where were they located?
17   A. Maine and New Hampshire.
18   Q. Okay. Did your responsibilities as a store manager
19   differ in any way between the Maine and New Hampshire stores?
20   A. Not that I recall.
21   Q. Okay. What was your next position after serving as a
22   store manager?
23   A. The position after store manager was an assistant
24   category manager.

Page 10

1    Q. When, just so we can place this in time, when did you
2    start working as an assistant category manager?
3    A. It was approximately June of 2016.
4    Q. How long did you serve in that role?
5    A. Oh goodness, um, I'd say for at least three years.
6    Q. Okay. And how many different categories did you work
7    in?
8    A. I worked on two different desks.
9    Q. Okay. What were the desks?
10   A. One we would call frozen; and the other we identified
11   as commercial, bread, breakfast, coffee, and tea.
12   Q. Okay. And what is, in this context, what does a
13   category mean?
14   A. What does a category mean?
15   Q. Yeah, when you say assistant category manager, what
16   does the "category" refer to?
17   A. A section in the store. For example, cereal, so
18   that's part of the breakfast category.
19   Q. When you worked in the second category, which included
20   bread, did that cover bakery departments?
21   A. No.
22   Q. Okay. What category covers bakery departments?
23   A. It would be on the fresh side of our business.
24   Q. Okay. So is there a category called "fresh"?

Page 11

1    A. Bakery.
2    Q. Okay. So is there a specific category for bakery?
3    A. Yes.
4    Q. Okay. So there would be an assistant category manager
5    for bakery?
6    A. As far as I understand there is one.
7    Q. Okay. And you said you were in that position for
8    about three years; is that right?
9    A. I believe approximately three years.
10   Q. And where did you work physically?
11   A. At the home office in Scarborough, Maine.
12   Q. All right. And what was next position after assistant
13   category manager?
14   A. I became a category manager.
15   Q. For which category?
16   A. It was actually the coffee, tea, breakfast, and bread
17   category.
18   Q. And how long did you serve in that role?
19   A. Approximately a year and a half. It might've reached
20   two years.
21   Q. Okay. And what is the role of a category manager
22   generally?
23   A. Generally, to my knowledge, it's managing those
24   categories we're assigned, um, an assortment that we bring into

Page 12

1    our stores, vendor relationships, understanding trends in the
2    market.
3    Q. And after you served as a category manager, what was
4    your next position?
5    A. Manager of business process change.
6    Q. Okay. Is that your current job?
7    A. It is not.
8    Q. Okay. How long did you serve as manager of business
9    process change?
10   A. Approximately a year and a half.
11   Q. All right. And during that time, did you report to
12   Jeremy Stevens?
13   A. I did.
14   Q. Okay. So during what time period did you work as a
15   manager of business process change?
16   A. This Memorial Day would have been two years. So if I
17   backtrack and do the math, it was Memorial Day of 2020 up until
18   about April of this year. Sorry, I'm a little fuzzy on the math
19   and the timeline.
20   Q. That's okay, I understand that's your best estimate.
21       And then how did your job change in April of '21?
22   A. Um, actually, it's April of '22.
23   Q. Of '22, yes, I'm sorry, April of '22.
24   A. I was asked to take on a special assignment.

Page 13

1    Q.  Okay.  What's the special assignment?
2    A.  A manager of fresh operations.
3    Q.  Okay.  And what are your responsibilities as manager
4  of fresh operations?
5    A.  I oversee 10 field specialists in regards to
6  supporting retail with the operations on the fresh department.
7    Q.  Okay.  And when you say it's a special assignment, why
8  is it a special assignment?
9    A.  I'm currently temporarily filling in while the current
10  manager of fresh operations is also filling in for another role
11  that was open.
12    Q.  Got it.  Do you have an understanding about how long
13  you'll be serving in this position?
14    A.  Yes.
15    Q.  What is that?
16    A.  It's currently written to be until October of 2022.
17    Q.  Okay.  Just give me one second.  I'm going to turn off
18  my camera because I have to grab something, one sec.
19        With respect to the 10 field specialists, can you give
20  a few examples of what types of categories or areas those field
21  specialists cover?
22    A.  Yeah.  Our responsibility is all fresh departments, so
23  meat, seafood, bakery, deli, produce.
24    Q.  And what are the responsibilities of a field

Page 14

1  specialist?
2    A.  At a high level it can include supporting stores with
3  operational opportunities, supporting them with gaining
4  information, training needs, understanding shrink results.  It
5  really varies on the need of the store and the support that's
6  present at the time.
7    Q.  Okay.  And in your role as manager of fresh
8  operations, do you work out of the corporate office?
9    A.  Currently, I work from home remotely.  We have a
10  hybrid model.
11    Q.  Okay.  And pre-pandemic, did the manager of fresh
12  operations, to your knowledge, work in the corporate office?
13    A.  It depends, they could have also been hybrid at the
14  time.
15    Q.  Okay.  What about --
16    A.  Oh, go ahead, sorry.
17    Q.  What about the field specialists, where do they work?
18    A.  Remotely in the field.
19    Q.  Okay.  And do the field specialists have anybody who
20  report to them?
21    A.  No.
22    Q.  Okay.  So do field specialists go out and visit
23  stores?
24    A.  Yes.

Page 15

1    Q.  Okay.  And so like if the field specialists were
2  bakery, for example, is there such a field specialist?
3    A.  Not in that exact terminology or description.
4    Q.  Okay.  Which field specialist includes bakery within
5  their area of responsibility?
6    A.  Not fully in the area of responsibility that would
7  fall to my team.
8    Q.  Okay.  Can you describe why that is?
9    A.  So my team is operationally focused on all fresh
10  departments, they're not assigned just one fresh department.
11    Q.  I see.  So the 10 field specialists don't have
12  separate areas of responsibilities in terms of the type of
13  department that they are responsible for?
14    A.  Correct.
15    Q.  Are they assigned geographically?
16    A.  Yes.
17    Q.  I see.  So the field specialist assigned to a
18  particular area, they would work with the department, the fresh
19  department managers in their area?
20    A.  Yes.
21    Q.  Okay.  All right, let's go to your time serving as
22  manager of business process change.  What were your duties in
23  that position?
24    A.  Yep, primary duties of manager of business process

Page 16

1  change included connecting with all business partners that may
2  impact retail with programs or projects.  I also managed the
3  store communications team at the time, partway through; that was
4  a new addition.  And then also was the, considered the
5  distribution and transportation liaison with one of our other
6  entities, not Hannaford, but ADUSA transportation and
7  distribution teams.
8    Q.  And with respect to the first area, working with
9  business partners, what was the purpose or purposes for which
10  you were working with business partners?
11    A.  We helped to essentially be pseudo-project managers,
12  myself and a small team, to ensure that we were aware of what
13  would be rolling out to retail at any one time, um, more around
14  awareness, and also supporting them in any needs for connecting
15  the dots.  So one department, for example, maybe produce had a
16  new program but they didn't know who to talk to in food safety.
17  It's ensuring those connections were made.
18    Q.  Okay.  So when you say a new program, what department
19  or departments would be responsible for developing a new
20  program?
21    A.  It could be any department within Hannaford home
22  office or other entities such as RBS.
23    Q.  Okay.  So just to use a more concrete example, if a
24  change was going to be made in the bakery department about how

Page 17

1 things were done in that department, where would that change
2 originate?
3   A.  Uh, to be honest, to my knowledge, it could originate
4 from many different areas.
5   Q.  Okay.  Such as what?
6   A.  An example that I'm aware of is we could have
7 financial impact that would be initiated by our finance team in
8 cooperation with our bakery team.  It could come from different
9 areas.
10  Q.  Okay.  For example, if the bakery department was going
11 to be presenting products in a different manner, so there's
12 going to be different types of displays, where would a change
13 like that originate?
14  A.  Really not being as involved in that instance with the
15 bakery team, I don't know that I could really accurately answer
16 that.
17  Q.  Okay.  During the time you worked as manager of
18 business process change, were there any new programs that were
19 rolled out that involved the bakery department?
20  A.  Off the top of my head, I can't name exactly one.
21  Q.  Can you think of any specific examples of new
22 practices that were rolled out during the time you were manager
23 of business change, not limited to bakery, but with respect to
24 any department?

Page 18

1   A.  Yeah, an example that sticks out is slip-resistant
2 shoes.  It's a program we didn't have in the stores or in
3 Hannaford while I was a manager of business process change.  Our
4 safety department made us aware of it, and that was something
5 that was rolled out.
6   Q.  Okay.  Can you think of any other examples?
7   A.  And another example could be...
8       Hum, changes that came through.
9       So we had, um, partnered or we had been made aware by
10 our deli team that we were going to be testing a new package for
11 our rotisserie birds, so a new style package which would impact
12 a new process for packaging up those birds at retail.
13  Q.  Okay.  So using that example, when you say the deli
14 team made you aware of it, what do you mean by the deli team?
15  A.  Business process change directly is contacted by our
16 merchandising managers, so in that instance it was the deli
17 merchandising manager.
18  Q.  Okay.  And then what role did your department play
19 with respect to rolling out that change?
20  A.  As stated before, ensuring that the dots were
21 connected with other business partners such as food safety,
22 labor and productivity, retail training.  We would make sure
23 that those teams connected and there was a plan in place to roll
24 that change or that program out to retail.

Page 19

1   Q.  Okay.  And when you connected with labor and
2 productivity, what were the issues that they were expected to
3 address?
4   A.  We weren't always when -- by "we," I mean business
5 process change -- weren't always part of those conversations, we
6 just ensured that the connection was made.
7   Q.  Okay.  So between labor and productivity and who?
8   A.  Merchandising, so the merchandising manager who made
9 us aware of the program.
10  Q.  So as manager of business process change, did you have
11 any involvement in, for example, developing new training for
12 associates with respect to new processes?
13  A.  Not in the development of it, no.
14  Q.  Okay.  Did you have any involvement with any changes
15 to labor standards?
16  A.  No.
17  Q.  Okay.  Do you know what labor standards are?
18  A.  I have an understanding of what they are, but probably
19 couldn't give an exact definition.  It's not my area.
20  Q.  Okay.  Who reported to you when you were manager of
21 business process change?
22  A.  So I had two associates report to me.
23  Q.  Okay.  And what were those --
24  A.  No, actually --

Page 20

1       Oh sorry, I need to correct that.
2   Q.  Yes, go ahead.
3   A.  I actually had three because business process change
4 and store communications were at one time reporting in to me.
5   Q.  Okay.  And what were the roles of those three
6 associates?
7   A.  One was a business process change coordinator
8 position, one is a business process change specialist, and the
9 third one is a supervisor of store communications.
10  Q.  All right.  Have you, throughout the course of your
11 employment at Hannaford, have you had any involvement in
12 revising any labor standards?
13  A.  No.
14  Q.  Okay.  With respect to the store communication
15 function when that was under you when you were manager of
16 business process change, what duties were performed in that
17 area?
18  A.  As manager of business process change with store
19 communications, I was responsible for supporting that process
20 and team that manages the tool called Compass, which is our
21 primary tool for communicating to retail.
22  Q.  Okay.  And it sounds like from what you said before,
23 there was one person who was responsible for primarily focusing
24 on store communications?

Case 1:21-cv-11901-WGY   Document 27-3   Filed 07/29/22   Page 7 of 11

Judith Prinzo vs                                                                 Heather Trodella
Hannaford Bros. Co. LLC                                                          June 15, 2022

Page 21

1   A.  I had a supervisor who had two additional co--
2       Oh, I actually can't remember off the top of my head
3   their titles.  Hum, specialists, they might be coordinators.
4       -- that reported in to the supervisor role, and the
5   supervisor reported in to me.
6   Q.  Who was the supervisor?
7   A.  Their name?
8   Q.  Yes.
9   A.  Tanya Brandes.
10  Q.  Okay.  And do you know who's currently serving in that
11  role now?
12  A.  She is, Tanya Brandes is.
13  Q.  Where had she been reporting prior to the time she
14  started reporting to you?
15  A.  She was not in the role when the structure was
16  different.
17  Q.  Okay.  What is Compass?
18  A.  Compass is an application, a web application that we
19  use for communication from home office to retail.
20  Q.  Okay.  Can you provide an example of a type of
21  communication that might be sent out through Compass?
22  A.  Yeah, a recent one that we had is our president Mike
23  Vail wanted to acknowledge Pride month, had drawn up a
24  communication with information about how we support that, and

Page 22

1   that was drafted through Compass and sent to stores where they
2   could receive it and read it.
3   Q.  Okay.  And so the different communications that go
4   through Compass, are they tracked?
5   A.  To my knowledge, there is a way to retrieve them out
6   of the tool itself.
7   Q.  And is there a way to target communications to
8   different audiences?
9   A.  Yes.
10  Q.  Okay.  So each communication doesn't necessarily go to
11  everybody in the company but just to specified groups?
12  A.  Correct.
13  Q.  Let me share my screen with you if I can.  Just a
14  second.
15      All right, let me blow this up so you can see it
16  better.
17      All right, I'm showing what previously was marked as
18  Exhibit 9.  Can you see this well enough to at least identify
19  what it is?  If you need me to make it bigger, just let me know.
20  A.  No, I can read the information on it, I'm just not
21  sure I'm familiar with what report this is.
22  Q.  Okay.  That's what I was going to ask you is if, do
23  you recognize what this report is?
24  A.  Not necessarily.  I can make assumptions, but I don't

Page 23

1   want to do that.
2   Q.  Does the Compass program include sending out projects
3   to individuals within stores?
4   A.  It does not include sending out projects to
5   individuals.
6   Q.  Okay.  Does it include sending out projects to, as it
7   says here over towards the right, project owners?
8   A.  Reading that column, project owners, and seeing what's
9   in that, so store manager, manager on duty, yes, that looks
10  familiar to how Compass can send projects.
11  Q.  Okay.
12      MR. GLASGOW:  Steve, what's the Bates number on this?
13      MR. CHURCHILL:  This is...
14      Oh, it's up at the top here is --
15      MR. GLASGOW:  Oh, okay, I got it.  Yeah, thanks.
16      MR. CHURCHILL:  -- 91240.
17      MR. GLASGOW:  Thanks.  I don't think you gave this an
18  exhibit number.
19      MR. CHURCHILL:  This was previously marked as Exhibit
20  9.
21      MR. GLASGOW:  Okay.  All right, thanks.
22  BY MR. CHURCHILL:
23  Q.  So does this appear to you to be a report from the
24  Compass system?

Page 24

1   A.  It looks similar to ones that I've seen before, yes.
2   Q.  Okay.  And to the extent there are projects within the
3   Compass system, who originates those projects?
4   A.  It can vary.
5   Q.  Okay.  How so?
6   A.  We have two accesses I guess would be the best way to
7   say it:  We have a brand access, so someone within the Hannaford
8   brand that could create projects; and we have also have a global
9   access which could be someone outside of our brand that supports
10  the brand.
11  Q.  Okay.  And with respect to brand access, who within
12  Hannaford or what department within Hannaford would originate
13  those projects?
14  A.  They're multiple for me to list off, probably too
15  many.
16  Q.  Okay.
17  A.  But many departments within the Hannaford home office
18  have access by a member of their team who can create projects
19  that would go through Compass.
20  Q.  Okay.  So this appears to show specific projects, are
21  there also communications sent out through Compass that are not
22  projects but just communications about information?
23  A.  We do have communication about information, but I
24  always reference them all as "projects."

Page 25

1  Q. Okay. So the example you gave recently where Mike
2  Vail sent out a communication about Pride month, was that a
3  project?
4  A. Yes, everything that goes out through Compass is
5  considered a project.
6  Q. Okay. And every project has a specified project
7  owner?
8  A. At least one.
9  Q. Okay. Who, if you know, is responsible for monitoring
10 the execution status of projects sent out through Compass?
11 A. I don't know off the top of my head that we have a
12 standard of monitoring for any one person within the brand.
13 Q. Okay. Are there any other systems that are used to
14 send out communications to stores other than Compass?
15 A. To my knowledge, e-mail and phone call are also ways
16 that stores are contacted.
17 Q. Okay. Any other systems that you're aware of?
18 A. Off the top of my head, nothing comes to mind that
19 would be direct to our retail partners.
20 Q. Did you, when you were manager of business process
21 change, have any involvement with Voice of Retail?
22 A. Yes, Voice of Retail lives within the store
23 communications team.
24 Q. Okay. So what responsibilities did the store

Page 26

1  communications team have with respect to Voice of Retail?
2  A. Managing the flow and the tool itself.
3  Q. Okay. Other than Compass --
4     Well, first of all, is Voice of Retail part of Compass
5  or is it a separate system?
6  A. It's a separate system.
7  Q. Other than Compass and Voice of Retail, are there any
8  other systems that were used within the communications team?
9  A. The only other thing I can think of is we do have a
10 tool that will send a phone call alert in what we call a point
11 of sale alert.
12 Q. All right, let me show you another document. This was
13 previously marked as Exhibit 56. And just so you understand, a
14 previous version of it was marked as Exhibit 4, which is why
15 that sticker is on there, not to confuse things too much.
16    Do you recognize what this document shows?
17    MR. GLASGOW: Can you make it a little bigger, Steve?
18    MR. CHURCHILL: Yeah.
19    MR. GLASGOW: Thanks.
20    THE WITNESS: I recognize parts of it. So, for
21 example, the activity description, some of those activities look
22 familiar to me. But this report itself is not something that I
23 used or have used.
24 BY MR. CHURCHILL:

Page 27

1  Q. Okay. Have you ever reviewed lists of fixed activity
2  labor standards?
3  A. No, not really.
4  Q. Okay. Were you ever involved -- I may have asked this
5  before -- were you ever involved in the revision of any labor
6  standards in any of your roles?
7  A. To the best of my knowledge, not directly.
8  Q. Okay.
9     MR. CHURCHILL: All right, why don't we take a break.
10 I may not have much more. Let me just look through my notes,
11 and so let's take 10 minutes. And this will be our last break I
12 expect. So I'll see you at 1:40?
13    THE WITNESS: Okay.
14    MR. GLASGOW: Sounds good. Thanks, Steve.
15    MR. CHURCHILL: Sure.
16 (Whereupon, a break was taken from 1:30 p.m. to 1:39 p.m.)
17 BY MR. CHURCHILL:
18 Q. Let me share my screen again with you, Ms. Trodella.
19    All right, I'm showing you the transcript that was
20 made from the deposition of Jeremy Stevens. Can you read that?
21 A. Yes, I can read --
22 Q. I mean can you see the words?
23 A. Nope, I can read it.
24 Q. Okay. So directing your attention, this is page 31,

Page 28

1  and just starting at 9, can you just -- or actually go up to
2  7 -- can you just read the rest of that page to yourself and let
3  me know when you're done?
4  A. Okay.
5     Okay, I've gotten to line 25.
6  Q. Okay, let me go to the next page, 32, and if you can
7  just read down to line 8?
8  A. Okay.
9     Okay, I'm done with line 8.
10 Q. So just to read that last answer he gave there
11 starting on line 25 of page 31, he says:
12    "We might have a new sign kit that we identify, and
13 they would help make sure all the training guides were updated;
14 that all of our standard practice training aids were updated to
15 reflect the new sign kit; make sure that if there was an impact
16 to labor standards, that the labor standards were updated and
17 the scheduling system was updated with the time it takes to
18 manage the new sign kit; and then they would communicate that
19 out to stores."
20    Do you see that?
21 A. Yep -- yes, sir.
22 Q. And does that accurately describe what you would do as
23 manager of business process change or what your department would
24 do?

Page 29

1     MR. GLASGOW: Objection, form.
2     A. Yes, it does accurately describe to an extent of what
3  we would do. I believe it is the understanding of the actual
4  wording to what level we do those pieces.
5     Q. Okay. So when it says that "all of our standard
6  practice training aids were updated to reflect the new sign
7  kit," to what extent did your department do that?
8     A. In that example, we would ensure that the connection
9  between the business owner and the retail training team was
10 made, and that both parties felt comfortable that all of the
11 standard practices that were impacted were updated. My team did
12 not directly handle any of the actual updates.
13    Q. Okay. And then the next item was: "Make sure that if
14 there was an impact to labor standards, that the labor standards
15 were updated and the scheduling system was updated with the time
16 it takes to manage that new sign kit." Is that something your
17 department did?
18    A. Not directly.
19    Q. Okay. Did it have any involvement with that process?
20    A. Very similar to the last one I mentioned, it would be
21 ensuring that the two parties that were responsible for those
22 areas were connected and that they agreed and felt comfortable
23 that the information or impacts were understood, identified, and
24 adjusted as need.

Page 30

1     Q. Okay. And with respect to that particular step, who
2  were the two parties that you needed to make sure were
3  connected?
4     A. In looking at that, so labor standards, that would be
5  our labor and productivity department, and then it would be any
6  business owner of the program or project that's in question.
7     Q. Okay. And then the final "then they would communicate
8  that out to stores," is that something that your department was
9  involved with?
10    A. Involved with, yes.
11    Q. Okay. What was the nature of your department's
12 involvement?
13    A. If a communication needed to go out to retail, we
14 would aid that business owner in ensuring that it was crafted
15 within certain standards that we had; and if they did not have
16 access to Compass, we would be the team that would put it into
17 Compass to be sent out to stores.
18    Q. Okay. And when you say certain standards that you
19 had, what standards are you referring to?
20    A. It could be typical font is Arial, size 16. It would
21 just be more formatting in that sense.
22    Q. And is that something your communications area would
23 have worked on?
24    A. Yes.

Page 31

1     Q. Okay. All right. When you worked as an assistant
2  store manager, did you have any responsibilities for overseeing
3  department managers?
4     A. As an assistant store manager, yes.
5     Q. And what was your role with respect to overseeing
6  department managers?
7     A. At the time when I was an assistant store manager, I
8  would be responsible for checking in with the department
9  managers, performance conversations, and ensuring that the
10 standards of the department were being met.
11    Q. Okay. And when you say standards of the department,
12 what do you mean by that?
13    A. An example is we like to have consistency in our
14 stores that our fresh departments are set up by 10 a.m., so it
15 would be my responsibility to ensure our fresh departments were
16 achieving that.
17    Q. Okay. Did you have any responsibility with respect to
18 performance reviews for department managers while you were
19 assistant store manager?
20    A. It varied, but in some cases I did.
21    Q. And what was the nature of your involvement?
22    A. It could go from adding input to their performance
23 appraisal based on my supervision and what I saw in the store as
24 far as actually giving the performance appraisal.

Page 32

1     Q. Okay. And when you were assistant store manager, were
2  you aware of the schedules that department managers worked?
3     A. Yes, yes, I was.
4     Q. And how many hours were department managers typically
5  scheduled for?
6        MR. GLASGOW: Objection, form.
7     A. Typically scheduled would be 45 hours a week.
8     Q. And was the same true when you worked as a store
9  manager?
10       MR. GLASGOW: Objection, form.
11    A. Yes, I believe it was.
12    Q. Okay. And when you were an assistant store manager,
13 did you make observations about how many hours store department
14 managers actually worked?
15       MR. GLASGOW: Objection, form.
16    A. What do you mean my observations?
17    Q. Were you aware of the number of hours they actually
18 worked?
19    A. As an assistant store manager to an extent I was
20 aware, but I did not track it exactly.
21    Q. Okay. And to the extent you were aware, what were the
22 number of hours that department managers worked relative to
23 their scheduled hours?
24       MR. GLASGOW: Objection --

Page 33

1   A.  It varied.
2       MR. GLASGOW: -- objection, form.
3   Q.  When you say it varied, what do you mean by that?
4   A.  It could be more, it could be less.
5   Q.  Okay.  Would department managers typically be
6   permitted to work less than their scheduled hours?
7   A.  Did I hear you say "typically"?
8   Q.  Yes.
9   A.  I don't know that I would agree and say typically.
10  Q.  But it could happen from time to time?
11  A.  Yes, it could happen.
12  Q.  And did department store managers typically work more
13  than their scheduled hours?
14      MR. GLASGOW:  Objection, form.
15  A.  Again, I don't know that I could agree with the word
16  "typically" in that statement.
17  Q.  Okay.  So to your awareness, department store managers
18  typically worked around the 45 hours they were scheduled?
19      MR. GLASGOW:  Objection, form.
20  A.  I think it can be subjective to using the word
21  "typically," so I don't know that I could agree and say yes.
22  Q.  I think you froze, at least on my screen.
23      MR. CHURCHILL:  Was it just me or did everybody else
24  get the whole answer?  I guess it was just me.  Kelley, can you

Page 34

1   read the full answer?  I just, I missed the last part of it.
2       COURT REPORTER:  Sure.  [Reads back requested answer.]
3   BY MR. CHURCHILL:
4   Q.  Okay, I understand that "typical" can be understood
5   subjectively different ways, I'm just trying to understand what
6   your observations were.  And it sounded like previously you said
7   they didn't typically work fewer than 45 hours and they didn't
8   typically work more than 45 hours, so I'm trying to understand
9   if your observation was that they typically or usually worked
10  around the 45 hours that they were scheduled?
11      MR. GLASGOW:  Objection, form.
12  A.  It really varied.  They could work more, they could
13  work less, or they could work the 45 on the dot.
14  Q.  All right.  How were you aware of the number of hours
15  they were working?
16  A.  If I needed to know what they were working, I would
17  have a conversation with the department manager themselves,
18  possibly our associate relations managers within the stores, but
19  again, it varied on the awareness of their hours.
20  Q.  Okay.  Were department managers required to check in
21  with anyone when they arrived to work?
22  A.  They usually checked in and said hi.  And as an
23  assistant store manager, I usually checked in and knew who was
24  in the store.

Page 35

1   Q.  Okay.  And when they left at the end of the day, were
2   they expected to check out with anybody?
3   A.  For the most part, yes, checking out with a member of
4   store leadership.
5   Q.  Okay.  When you worked as both an assistant store
6   manager and a store manager, who had final approval authority
7   for terminating an employee?
8       MR. GLASGOW:  Objection, form.
9   A.  To the best of my knowledge when that happened, final
10  approval would come from a partnership of the store leader, the
11  district operation manager, and our HR business partner, I
12  believe.
13  Q.  Okay.  When you say store leader, do you mean the
14  store manager?
15  A.  Yes.
16  Q.  Okay.  With respect to hiring when you worked as an
17  assistant store manager and store manager, who had final
18  approval for any hiring decisions?
19      MR. GLASGOW:  Objection, form.
20  A.  Final approval could come from varied sources.  It
21  really could come from varied sources within the store.
22  Q.  Okay.  What were the various sources?
23  A.  When I was in retail at the time, it could be the
24  store manager depending on the role; it could be the associate

Page 36

1   relation manager; it could be the department manager making the
2   call to want to hire a particular candidate.
3   Q.  And if a department manager wanted to hire a
4   particular candidate, did the department manager need to get
5   approval from any other parties?
6   A.  To my knowledge, not all the time.  They just would
7   have to follow making sure that the associate relations manager
8   was aware to do more of the administrative functions.
9   Q.  Okay.  And what about setting pay for new hires, who
10  was responsible for that?
11  A.  There was guidance at the time based off of staffing
12  models and pay structures that they would be able to utilize and
13  align with, it could be arm [phonetic] or store manager at the
14  time.
15  Q.  And I think this is clear from your testimony before
16  but just to make sure, you never worked in the role of a
17  department manager; is that correct?
18  A.  Correct.
19  Q.  Okay.  And do you understand that department managers,
20  at least right now, are exempt from overtime?
21      MR. GLASGOW:  Objection, form.
22  A.  To be honest, I don't actually know their official
23  status right now.
24  Q.  Okay, all right, fair enough.  During the time you

Page 37

1  worked as store manager and assistant store manager, were
2  department managers exempt from overtime during those periods?
3       A.  Yes, I believe they were.
4       Q.  Okay.
5       MR. CHURCHILL:  All right, I don't have any further
6  questions.
7       MR. GLASGOW:  I don't have any either.  We'll take
8  PDFs with exhibits.
9  (Whereupon, the deposition concluded at 1:54 p.m.)

Page 38

1       ERRATA SHEET DISTRIBUTION INFORMATION
2       DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
3
4       ERRATA SHEET DISTRIBUTION INFORMATION
5
6       The original of the Errata Sheet has been delivered to
7  Ryan A. Glasgow, Esquire.
8       When the Errata Sheet has been completed by the
9  deponent and signed, a copy thereof should be delivered to each
10  party of record and the ORIGINAL forwarded to Stephen Churchill,
11  Esquire, to whom the original deposition transcript was
12  delivered.
13       INSTRUCTIONS TO DEPONENT
14
15       After reading this volume of your deposition, please
16  indicate any corrections or changes to your testimony and the
17  reasons therefor on the Errata Sheet supplied to you and sign
18  it.  DO NOT make marks or notations on the transcript volume
19  itself.  Add additional sheets if necessary.  Please refer to
20  the above instructions for Errata Sheet distribution
21  information.

Page 39

1  PLEASE ATTACH TO THE DEPOSITION OF:  Heather Trodella
2  CASE:  Judith Prinzo v. Hannaford Bros. Co., LLC
3  DATE TAKEN:  June 15th, 2022
4            ERRATA SHEET
5  Please refer to Page 38 for Errata Sheet instructions and
6  distribution instructions.
7  PAGE LINE       CHANGE          REASON
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  I have read the foregoing transcript of my deposition, and
17  except for any corrections or changes noted above, I hereby
18  subscribe to the transcript as an accurate record of the
19  statements made by me.
20
21  Executed this _____ day of _____, 2022.
22
23            _____
24            Heather Trodella

Page 40

1  COMMONWEALTH OF MASSACHUSETTS            HAMPSHIRE, ss.
2
3  I, KELLEY K. BOHAN, a Court Reporter and Notary Public duly
   commissioned and qualified in and for the Commonwealth of
4  Massachusetts, do hereby certify that there came before me on
   the 15th day of June, 2022, at 12:59 p.m., the person
5  hereinbefore named, identification as prescribed by Executive
   Order 455 (03-13) issued by the Governor of the Commonwealth of
6  Massachusetts, was by me duly sworn to testify to the truth and
   nothing but the truth of her knowledge concerning the matters in
7  controversy in this cause; that she was thereupon examined upon
   her oath, and her examination reduced to typewriting under my
8  direction; and that this is a true record of the testimony given
   by the witness to the best of my ability.
9  I further certify that I am neither attorney or counsel
   for, nor related to or employed by, any of the parties to the
10  action in which this deposition is taken, and further, that I am
   not a relative or employee of any attorney or counsel employed
11  by the parties hereto or financially interested in the action.
12
13
14       My Commission Expires:  December 25, 2026
15
16
17       _____
18
19       Kelley K. Bohan
         Court Reporter/Notary Public