Page 1

1            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
2
                       C.A. No:  1:21-cv-11901-WGY
3
4                                    Volume:  I
                                   Pages:  1-81
5                                 Exhibits:  20
6
7      JUDITH PRINZO, on behalf of herself  )
        and all other employees similarly    )
8      situated,                             )
                                             )
9                  Plaintiff,                )
                                             )
10          v.                               )
                                             )
11     HANNAFORD BROS. CO., LLC,             )
                                             )
12                 Defendant.                )
13
14
15
16            DEPOSITION OF:  Chelsea Nelson
17
18            Conducted Remotely via Zoom
19
20               108 Lancaster Street
21
22          Leominster, Massachusetts 01453
23
24           January 12, 2022     10:00 a.m.

Page 2

```
 1  APPEARANCES:
 2  FAIR WORK, P.C.
      (BY:  Stephen Churchill, Esquire)
 3  192 South Street, Suite 450
      Boston, MA 02111
 4  On behalf of the Plaintiff
      steve@fairworklaw.com
 5
    HUNTON ANDREWS KURTH
 6  (BY:  Ryan Glasgow, Esquire)
      Riverfront Plaza - East Tower
 7  951 East Byrd Street
      Richmond, VA 23219
 8  On behalf of the Defendant
      rglasgow@huntonak.com
 9
    ALSO PRESENT:
10
    HUNTON ANDREWS KURTH
11  Christopher Pardo, Esquire (Observing)
      Riverfront Plaza - East Tower
12  951 East Byrd Street
      Richmond, VA 23219
13  On behalf of the Defendant
14  Anne Cunningham, Esquire (Observing)
      In-House Counsel for Hannaford Bros., LLC
15
    Judy Prinzo, Plaintiff (Observing)
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1              I N D E X
 2  WITNESS          DIRECT     CROSS
 3  Chelsea Nelson
 4  (By:  Mr. Churchill)   6        --
 5  (By:  Mr. Glasgow)        --
 6  (By:  Mr. Pardo)       --      --
 7  (By:  Ms. Cunningham)  --      --
 8
 9        I N D E X  O F  E X H I B I T S
10  EXHIBIT NO.    DESCRIPTION            PAGE:
    Exhibit 35    E-mail                47
11
    Exhibit 36    E-mail                48
12
    Exhibit 37    E-mail                49
13
    Exhibit 38    Hannaford Hiring Toolkit    49
14
    Exhibit 39    Massachusetts Interview    50
15              Questions about Convictions
16  Exhibit 40    Sydney Curpenski Personnel    53
              File
17  Exhibit 41    Ashley Scales Personnel File   54
18  Exhibit 42    Sample Offer Letters      55
19  Exhibit 43    Pay Guidelines         57
20  Exhibit 44    Pay Scale Assignments    58
21  Exhibit 45    MA1 Retail Pay Scale     60
22  Exhibit 46    MA2 Bakery Employee Pay    62
              Ranges
23
    Exhibit 47    Manager Salary Levels    64
24
    Exhibit 48    Hannaford Onboarding Module   66
```

Page 4

```
 1              Training Aids
 2  Exhibit 49    New Hire Orientation Script    66
 3  Exhibit 50    Retail Onboarding        67
              Facilitator Guide
 4
    Exhibit 51    Supervisor Call-In Report    70
 5
    Exhibit 52    Weekly Timecard Violations    71
 6
    Exhibit 53    Coaching Memo           73
 7
    Exhibit 54    E-mail                76
 8
    Exhibit 55    Performance Counseling Form   76
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
 1          P R O C E E D I N G S
 2      MR. CHURCHILL:  We've agreed to
 3  reserve all objections, except as to
 4  form, and motions to strike.
 5      MR. GLASGOW:  Agreed.
 6      MR. CHURCHILL:  And I'm just sure
 7  what court we're in or what rules
 8  there are, but to the extent there is
 9  any notarization requirement anymore -
10  I don't know if that's been the case
11  for yours - but we're going to waive
12  that, obviously.
13          S T I P U L A T I O N S
14      It is hereby stipulated and
15  agreed by and between counsel for the
16  respective parties that the witness
17  will read and sign the deposition
18  within thirty days or deemed waived
19  and the Notary shall be waived.
20      It is further stipulated and
21  agreed that all objections, except as
22  to form of question, and motions to
23  strike be reserved until the time of
24  trial.
```

2 (Pages 2 - 5)

Page 6

1    CHELSEA NELSON:  Having been
2 identified and duly sworn, was examined and
3 testified as follows:
4    DIRECT EXAMINATION BY MR. CHURCHILL:
5    Q.  Ms. Nelson, can you please state your
6 name?
7    A.  Chelsea Nelson.
8    Q.  Okay.  And what is your address, your
9 personal address?
10    A.  70 McCallion Street, Swansea, Mass.
11 02777.
12    Q.  And what is your current business
13 address?
14    A.  Um, sorry, I don't remember off the
15 top of my head.
16    Q.  Is it a store?
17    A.  Joseph E. Warner Boulevard in Taunton,
18 Mass; I forget the number.
19    Q.  Okay.  What is the location?  Is it a
20 store?
21    A.  Yes.
22    Q.  What store is it?
23    A.  Taunton store.
24    Q.  And what's your date of birth?

Page 7

1    A.  5-24-1988.
2    Q.  What's your educational background
3 starting with high school?
4    A.  I went to Apponequet Regional High
5 School in Lakeville or Freetown.  And I went to
6 Bristol Community College in Fall River and got
7 my associate's degree.  And then moved onto
8 UMass Dartmouth where I got my bachelor's in
9 liberal arts.
10    Q.  Okay.  When did you receive your
11 bachelors?
12    A.  What was that?
13    Q.  When did you receive your bachelor's
14 degree?
15    A.  Um, I believe it was 2004.
16    Q.  And your currently work for Hannaford,
17 is that right?
18    A.  Yes.
19    Q.  When did you first start working for
20 Hannaford?
21    A.  Sorry, I think that -- I'm not sure of
22 the date, um, my graduation date off the top
23 on my head.  I don't think... I'm not sure that
24 2004 is correct.

Page 8

1    Q.  Okay.  When did you first start
2 working for Hannaford?
3    A.  July 7th, 2006.
4    Q.  Okay.  Did you have any employment
5 after you finished at UMass and before you
6 started at Hannaford?
7    A.  No.  No, I actually started at
8 Hannaford right out of high school.  So yeah,
9 that 2004 date is not accurate.
10    Q.  Okay, but you do recall that you first
11 started working at Hannaford in 2006?
12    A.  Yes.
13    Q.  Okay.  Have you been deposed before?
14    A.  What was that?
15    Q.  Have you been deposed before?
16    A.  No.
17    Q.  Okay.  Let me just go over a few
18 ground rules for today?
19    A.  Sure.
20    Q.  If I ask you a question that you don't
21 understand then you can ask me clarification,
22 okay?
23    A.  Okay.
24    Q.  If you need to take a break for any

Page 9

1 reason just say the word; I'll certainly
2 accommodate that.  The only rule that we follow
3 is that if there's a question pending you
4 should answer the question and then we'll take
5 a break, okay?
6    A.  Okay.
7    Q.  Because a transcript is being made, a
8 written transcript, it's important that only
9 one of us be talking at a time, if possible.
10 So I'll try to wait until you're done with your
11 answers until I ask my next question.  And I'd
12 ask that you try and wait until I'm done with
13 my question before you start your answer, okay?
14    A.  Okay.
15    Q.  And that also gives your attorney a
16 chance to object if he chooses to do so.  It's
17 important that any responses be verbal as
18 opposed to nods or gestures because shaking
19 your head or nodding your head it's not clear
20 what that means in a transcript.  So it's
21 better if you can speak words as opposed to
22 making gestures, okay?
23    A.  Okay.
24    Q.  And because we're in the world of Zoom

3 (Pages 6 - 9)

Page 10

1 I wouldn't have to ordinarily have to ask about
2 this; is there anybody else in the room with
3 you?
4   A.  No.
5   Q.  Okay.  And can we agree that when
6 you're answering my questions, unless I direct
7 you to a document, that you'll answer my
8 questions without referring to any documents or
9 notes?
10   A.  Yes.
11   Q.  Okay.  When you first started working
12 at Hannaford what was your job?
13   A.  I worked as a bakery associate.
14   Q.  In which store?
15   A.  In the Middleborough.
16   Q.  Okay.  Who was the bakery manager at
17 that time?
18   A.  At the time it was Sabine Stands?
19   Q.  Okay.  And how long did you work as
20 the bakery associate?
21   A.  Until 2015.
22   Q.  So for about nine years?
23   A.  Yes.
24   Q.  Okay.  And during those nine years

Page 11

1 were you in Middleborough the whole time?
2   A.  Um, as a bakery associate, yes.
3   Q.  And did your manager ever change?
4   A.  Yes.  I don't remember exactly the
5 timing; but yes, the bakery manager did change.
6   Q.  And who was the next manager after
7 Sabine?
8   A.  Judith Prinzo.
9   Q.  Okay.  And was she your manager up
10 until 2015?
11   A.  Yes.
12   Q.  Do you recall, approximately, how long
13 it was that you worked under Sabine until Ms.
14 Prinzo took over?
15   A.  Um, approximately, two years.
16   Q.  Okay.  So you worked under Ms. Prinzo
17 for about seven years?
18   A.  I believe so.
19   Q.  Okay.  And then how did your position
20 change in 2015?
21   A.  I became the associate relations
22 manager trainee.
23   Q.  For what store?
24   A.  Um, it was for the district.  It

Page 12

1 wasn't tied necessarily to one store.  I
2 believe my base store was still Middleborough
3 at the time of my training, but I trained out
4 of other stores.
5   Q.  Okay.  And which district was that?
6   A.  District 21.
7   Q.  How did you get into the ARM trainee
8 program?
9   A.  Um, I don't recall the exact details,
10 but I do remember it had been posted and Judy
11 had actually mentioned the opportunity to me;
12 and I applied at that point.
13   Q.  And how long was the training process?
14   A.  Um, so I had started my training, I
15 believe, in late August of 2015.  And I, um,
16 they had kind of an interesting length.
17 Because it was through the holidays they kept
18 me in training longer than they typically
19 would.  So I was technically training through,
20 I believe, January of 2016.
21   Q.  And were you assigned to a principal
22 trainer?
23   A.  I had originally been assigned to a
24 trainer in the Milford store which is no longer

Page 13

1 a Hannaford.  But I spent about two weeks with
2 that trainer and then they were called on the
3 staffing project to help different stores in
4 the district; and I was asked to go with her.
5 That lasted about a month, approximately.  And
6 then after that they decided to train me in
7 another store which was our Uxbridge Hannaford,
8 and I stayed here until the remainder of the
9 time until, um, I believe it was late January
10 of 2016.
11   Q.  Okay.  And were there any training
12 courses that you took during that training
13 process?
14   A.  Um, I'm sure there were.  Just, um,
15 learning management system trainings that I had
16 took.  Um, but nothing that I can recall
17 specifically.
18   Q.  Okay.  So other than those training
19 programs that you may have taken, what else did
20 you do in order to learn the job of an ARM
21 during that training process?
22   A.  So I spent side-by-side time with the
23 associate relations manager in each of those
24 stores where they taught me the functions of

4 (Pages 10 - 13)

Page 14

1 the role.
2    Q.  Okay.  And can you tell me, again, I
3 think you said you started out in Milford, is
4 that right?
5    A.  Yes.
6    Q.  And then what other stores did you go
7 to during that training process?
8    A.  During the staffing part or just the
9 training part?
10    Q.  During the whole training, throughout
11 that entire process for staffing and training?
12    A.  For staffing, I believe, it was seven
13 different stores that we supported; some are no
14 longer Hannaford stores.  I don't recall each
15 of them.  I know we spent some time in Waltham.
16 Um, I believe we also went to Norwood, um,
17 Easton.  Um, I don't recall the rest of them.
18    Q.  Okay.  And the during the training,
19 the balance of the training program, what other
20 stores did you go to?
21    A.  Just the training portion of it was
22 just Milford and Uxbridge to my recollection.
23    Q.  Okay.  And then when you finished the
24 training process in January of 2016 where did

Page 15

1 you go?
2    A.  I applied for and accepted an interim
3 associate relations manager position at the
4 Marlborough Hannaford.
5    Q.  Okay.  And how long did you stay in
6 that position?
7    A.  I was there for roughly a year and a
8 half, I believe.
9    Q.  Okay.  So until some time in mid-2017?
10    A.  Yes.
11    Q.  Okay.  And where did you go from
12 there?
13    A.  Um, from there I went on a staffing
14 project.  I was basically floating throughout
15 District 20 and 21.  Um, the Marlborough
16 store's in District 20.  So at that point I was
17 sort of based in District 20, but floating
18 between the two to help out with staffing.  Um,
19 I spent some time in the Lunenburg store
20 covering as well.  So they were utilizing me
21 for things like covering stores if an ARM was
22 out or staffing.  Um, also spent some time in
23 the Waltham store doing some staffing as well.
24    Q.  Okay.  When you say a staffing project

Page 16

1 what do you mean by that?
2    A.  So I worked with the associate
3 relations specialist to help stores that were
4 in staffing need at the time.  And I would go
5 in and do some interviewing and, perhaps, make
6 offers; or just do the interviewing process for
7 the ARM that was in that store; and then help
8 them kind of get through that push for hiring.
9    Q.  Okay.  And for what types of positions
10 were you doing that?
11    A.  All types.  Um, but mainly associates
12 for different departments.
13    Q.  Okay.  And then did your job change
14 again?
15    A.  Um, it was... I don't remember the
16 exact date again, but it was late summer that
17 year.  September, perhaps.  And I took the
18 permanent associate relations manager
19 position - it was no longer interim - in the
20 Middelborough Hannaford.
21    Q.  And so that started around September
22 2017?
23    A.  I believe so, yes.
24    Q.  Okay.  How long did you stay in that

Page 17

1 position?
2    A.  I was there until around September of
3 2019 when I moved to the Taunton store where I
4 am now.
5    Q.  Okay.  And have your duties as an
6 associate relations manager in Marlborough,
7 Middleboro or Taunton been different depending
8 what store you're in?
9    A.  Um, I think there's a little bit of a
10 difference, yes, between each store.
11    Q.  What are your duties as an associate
12 relations manager?
13    A.  So it's a loaded question because, um,
14 it encompasses quite a lot.  Um, but mainly I
15 would say advising and assisting the store
16 manager team and department management team,
17 and that is a performance management training.
18 Um, I, um, do payroll, um, assist with that
19 whole process as well.  Um, and just kind of
20 the go-to person for associates, um, and, you
21 know, anything HR concerns that they may have
22 and try to that, um, sort of liaison between
23 the associates and the department managers.
24 Um, and yeah, I think that kind of gets out

5 (Pages 14 - 17)

Page 18

1 most of it.
2    Q.   Who do you report to in terms of
3 position?  Not the name, but the position?
4    A.   The position?  The store manager.
5    Q.   Okay.  Do you have a written job
6 description?
7    A.   Yes, I do.
8    Q.   Okay.
9    A.   Do I have it with me or?
10    Q.   No.  Is there a written job
11 description for the ARM position?
12    A.   Yes.
13    Q.   And is it different depending on what
14 store you're at?
15    A.   No.
16    Q.   Okay.  When you said before that your
17 job had varied depending on what store you're
18 in how has it varied?
19    A.   Um, just based off of management
20 styles.  Um, I think there is there, um,
21 there's always that sort of guideline that we
22 follow, um, of how where we want to end up, but
23 how we get there may change between stores.
24    Q.   Okay.  Can you explain what you mean

Page 19

1 by that?
2    A.   Um, so with certain store managers
3 they may like things done a certain way.  Or,
4 um, I also work with a department manager who,
5 um, you know, may like things done a concern
6 way; or how we work together may differ based
7 off of their management styles and my
8 management style and what best fits, um,
9 whatever the situation may be.
10    Q.   Okay.  So have you done any training
11 for any other ARMs or new ARMs?
12    A.   I trained a backup ARM for the
13 Middleborough store; but other than that, no.
14    Q.   Who replaced you as ARM in
15 Middleborough when you left?
16    A.   Alexandra Sweeney.
17    Q.   Okay.
18    A.   I did not train her.
19    Q.   I'm sorry?
20    A.   I did not train her.
21    Q.   Okay.  Do you know who did train her?
22    A.   Um, I'm not sure about all of her
23 training who exactly did that, no.
24    Q.   Okay.  And in the course of doing your

Page 20

1 job as an ARM, are there any written policies
2 or procedures that you use?
3    A.   Yes.
4    Q.   And what are the, generally speaking,
5 what are the types of policies and procedures
6 do you use?
7    A.   Um, we use all sorts of different
8 policies and procedures.  But if we're talking
9 generally what we would look at, um, respect in
10 the workplace, um, personal behavior policy,
11 um, attendance and punctuality policy.  Those
12 are sort of the common ones that tend to come
13 up.
14    Q.   And how do you access those -- these
15 are written policies, is that right?
16    A.   Yes.
17    Q.   How do you access them when you need
18 to refer to them?
19    A.   I generally use the portal, the
20 Hannaford portal.
21    Q.   And what do you mean by the portal?
22    A.   It's like an internet base that we can
23 search that information.
24    Q.   Okay.  And within the portal is there

Page 21

1 some type of folder or location for HR
2 policies?
3    A.   There's a space for HR, yes.  There's
4 an associate relations area that you can go to.
5    Q.   Okay.  Have you ever had any
6 involvement in the development of any of those
7 policies?
8    A.   No.
9    Q.   When you were at the Middelborough
10 store what store managers did you report to?
11    A.   When I first arrived there, um, there
12 was Jillian Sierra was the store manager at the
13 time.  And after her there was Brian Anderson.
14 And there were a few times in between where
15 there was no one and the assistant store
16 manager filled in.
17    Q.   Okay.  And who was the assistant store
18 manager on those occasions?
19    A.   At one point it was Daniel Mailloux
20 and at the other point it was Daniel Singer.
21    Q.   Going back to when you worked as a
22 bakery associate, were you full-time or
23 part-time?
24    A.   Um, I was part-time.

6 (Pages 18 - 21)

Page 22

1    Q.   Okay.  And what schedule did you work
2  during those years?
3    A.   Um, it varied quite a bit when I first
4  began working.  I worked mostly night shifts,
5  um, and then it changed.  And my life changed,
6  and my availability changed, and my schedule
7  changed; and I worked mostly mornings after
8  that.
9    Q.   And when did that change happen?
10   A.   Um, I believe at the point when I
11  going to college.  I'm not sure what the
12  timeframe was.
13   Q.   Okay.  When you made the switch from
14  evening to morning who was your manager at the
15  time?
16   A.   I don't recall if it was Judy or
17  Sabine.
18   Q.   Okay.  When you started working
19  mornings about how many hours a week did you
20  work?
21   A.   Um, I worked roughly thirty hours a
22  week.
23   Q.   Okay.  And in terms of the days of the
24  week that you worked, were there typical days

Page 23

1  that you worked?
2    A.   Um, I don't recall exactly what my
3  schedule was at that time.  I'm sure there were
4  typical days, but, um, schedules were never
5  set; so it did vary from week to week.
6    Q.   Okay.  And when you say mornings what
7  do you mean by that?  How early would you start
8  or how late would you go?
9    A.   I would generally come in at 5:00 a.m.
10  because I was baking, and it would vary on what
11  my end time would be.
12   Q.   Okay.  But generally you worked about
13  thirty hours a week?
14   A.   Yes.
15   Q.   Okay.  And when you would come in on
16  mornings at 5:00 a.m., who else would generally
17  be in the bakery?
18   A.   Um, at 5:00 a.m.?  Um, most of the
19  time I was alone at 5:00 a.m.  Um, generally
20  there wouldn't be anyone else scheduled for at
21  least an hour or so.
22   Q.   When you worked under Ms. Prinzo, what
23  time would she typically arrive at the bakery
24  department?

Page 24

1       MR. GLASGOW:  Objection to form.
2    A.   I don't recall exactly, but I believe,
3  generally, maybe around 7:00.  Again, I believe
4  it varied.
5    Q.   Did you ever work on weekends?
6    A.   Yes.
7    Q.   So you worked both; it could have been
8  Monday through Sunday, any of the seven days of
9  the week?
10   A.   Yes.
11   Q.   Okay.  And on the occasions when
12  Ms. Prinzo wasn't there who were you reporting
13  to?
14   A.   Um, it would be whoever was running
15  the department that day whether it would be
16  a shift lead or an assistant department
17  manager.
18   Q.   Okay.  And when you were there at the
19  same time as Ms. Prinzo, were you able to
20  observe what she was doing?
21       MR. GLASGOW:  Objection to form.
22   A.   Yes.
23   Q.   And what types of work did you observe
24  her doing?

Page 25

1    A.   Um, she would do anything from
2  customer service to, um, pulling frozen load,
3  putting away price to put out, um, I mean,
4  that's only what I could physically observe.  I
5  know she had other managerial responsibilities
6  that I didn't physically see necessarily.  But
7  those are the things that she would generally
8  do; package, do cakes, clean.
9    Q.   And during the times that you were
10  working, what were the greatest number of
11  employees who would be there at any particular
12  time in the bakery department?
13   A.   Physically in the department while I
14  was working?
15   Q.   Yes.
16   A.   Um, I would say, depending on if it
17  was a busy holiday or something like that, I
18  would say probably the most was around eight.
19  But, again, it would vary quite a bit.
20   Q.   Right.  Were there occasions when you
21  were the only one in the department?
22   A.   Yes.  When I came in very early in the
23  morning or maybe late at night when I was
24  closing the department.

7 (Pages 22 - 25)

1    Q.   When you were the ARM in
2  Middleborough, were there any meetings that you
3  attended on a regular basis?  Like daily
4  meetings, or weekly meetings, or any stand-in
5  meetings like that?
6    A.   We would generally have a meeting, a
7  department manager meeting, once a week.  Not
8  always once a week, but for the most part once
9  a week.
10   Q.   Okay.  Were there any other meetings
11 that you attended on a regular scheduled
12 bases?
13   A.   Um, I don't believe so, no.
14   Q.   Were the manager meetings at the same
15 time each week?
16   A.   Um, it varied, but generally we would
17 try to stick to a pretty regular schedule.
18   Q.   And how long were those meeting?
19   A.   Um, roughly an hour.
20   Q.   Okay.  And what topics typically were
21 discussed at those meeting?
22   A.   The store manager would usually talk
23 about sales and, um, sort of what was going on
24 in different departments.  So it would kind of

1  be an open discussion about, um, maybe
2  different products are coming out in a certain
3  department and they want to discuss that, um,
4  what our game plan is going it into holidays;
5  um, staffing, um, a variety of topics.
6    Q.   Did you record the amount of time that
7  you worked as an ARM?
8    A.   Can you clarify what you mean by
9  record?
10   Q.   Yeah.  So did you keep track, for
11 example, of when you arrived at work and when
12 you left work?
13   A.   Um, no.  Um, not specifically the time
14 from when I came and when I left.
15   Q.   Okay.  When you were ARM in
16 Middleborough what was your typical schedule?
17   A.   I would generally work 7:00 a.m. to
18 4:00 p.m. with one night a week.  And sometimes
19 on Sundays I would come in earlier because we
20 had to do payroll and I like to get a jump on
21 the day.  So I would do 6:00 a.m. to 3:00 p.m.
22   Q.   And what days of week did you
23 typically work?
24   A.   Um, usually I would do Sunday through

1  Wednesday and Friday.
2    Q.   Okay.
3    A.   But that could vary with business
4  needs.
5    Q.   And when you were working as ARM in
6  Middleborough how would you describe the
7  frequency of your interactions with Ms. Prinzo?
8    A.   Um, I would say we at least interacted
9  a few times a week.  Um, I mean, depending on
10 when we were both working I would come around
11 to the bakery and say hello, um, or she may
12 come to see me in my office.
13   Q.   And when you were working as ARM in
14 Middleborough what did you spend most of your
15 time doing?  If there was one task that took
16 more of your time than any other task what was
17 it?
18       MR. GLASGOW:  Objection to form.
19   A.   Um, that's very hard to say.  I guess
20 supporting the associates.
21   Q.   Okay.  When you came in each morning
22 did you have a standard practice of what you
23 would do at the beginning of the day?
24   A.   Yes.

1    Q.   What was that?
2    A.   Typically, check e-mail, um, check
3  tasks, um, and then I would go in and do
4  payroll.  So check the hours and send them to
5  the departments.
6    Q.   Okay.  And when you say check tasks
7  what do you mean by that?
8    A.   We have a program that, um, it used to
9  be a different program, but it's similar now.
10 But we are sent tasks to kind of check in on
11 from the company.  So if there's communication
12 that they needed to know about a particular
13 topic that would be how they would generally
14 communicate it to us verses sending out, like,
15 a mass e-mail.  They would send out a task for
16 department managers or for the ARMs.  So I
17 would check to make sure that there was nothing
18 communicated that I needed to take action on.
19 Um, and then I would generally, um, either
20 check e-mail from there or do the hours.
21   Q.   All right.  Did you, other than
22 reporting to the store manager, did you have
23 any kind of dotted line reporting relationship
24 to another HR person?

Page 30

1    A.  Um, the HR specialist, the associate
2  relation specialist.
3    Q.  Okay.  And who was that when you were
4  at Middleborough?
5    A.  Um, when I was at Middleborough it was
6  Sean O'Connor.
7    Q.  Okay.  And where did Mr. O'Connor work
8  physically?
9    A.  The general office in Leominster, I
10  believe; but I don't know exactly if, you know,
11  he did any remote work or anything like that.
12    Q.  And was Mr. O'Connor assigned to any
13  particular district or districts?
14    A.  Um, yes.  He's assigned to District 20
15  and 21.
16    Q.  And who does he report to, if you
17  know?  Or who did he report to at the time?
18    A.  I'm not sure.
19    Q.  Okay.  So you said you came in and
20  would check e-mail and tasks, and then would do
21  payroll.  What types of tasks would you do in
22  connection with payroll?
23    A.  So I would check to see if anyone had
24  any missed punches.  So I would call the

Page 31

1  departments and see if they, um, knew when
2  somebody had left or if the associate could
3  verify for me, um, correct to those punches in
4  the system.  I would run the exceptions report
5  to see if anyone missed breaks.  Then I would
6  run the average report and check through to
7  make sure everything looked okay.  If something
8  looked off I'd check in with the department.
9  Um, I would maybe at this time notice that an
10  associate worked in a department that they
11  don't typically work in or something of the
12  nature.  And that's when I would, you know, get
13  involved with the department managers to check
14  in and see if there was a discrepancy that
15  needed to check in about.  And then I would
16  generally send those hours out to the
17  department managers and copy the store
18  managers; and let them know that these are the
19  hours for the week thus far, and ask them if
20  they had any changes that would have to be
21  made.
22    Q.  Okay.  So when you say these are the
23  hours that you had thus far, was that report
24  one that showed hours that had been logged

Page 32

1  compared to budget or schedule or compared to
2  anything else?
3    A.  Um, that report just shows the
4  actually hours, generally, I believe.  I don't
5  think it has the full hours on it.
6    Q.  Okay.  And when you said that you
7  would look at the hours to make sure everything
8  was okay what do you mean by okay?  What were
9  you looking at?
10    A.  So I was checking to make sure that
11  associates didn't miss breaks, miss lunches,
12  miss any punches.  Um, checking to make sure
13  that folks are in the correct department.  So
14  if I knew that if a department manager had
15  already told me that they were going to be
16  having an associate maybe from the front end
17  working in the center store I would make sure
18  that they were in the right place; and if not,
19  I would make that change.  Um, so I was looking
20  at things like that most of the time.
21    Q.  Okay.  And once you did those payroll
22  tasks that you just described what would you do
23  next?
24    A.  Um, so I would send that to the

Page 33

1  department managers and the store managers and
2  ask if they needed anything changed.
3    Q.  Okay.  So after you did those payroll
4  tasks what tasks did you do next?
5    A.  Um, so I would just kind of see what
6  was on my plate for the day.  It could be a
7  variety of things.  Um, sometimes I would check
8  in with the store manager and see if they
9  needed anything from me; check in with the
10  department manager and see if they needed
11  anything.  Um, I would, um, you know, check my
12  e-mail, go through anything that may be needed.
13  It could be, um, maybe I have to check in with
14  somebody about a leave of absence or, um, look
15  at sick slips that have come in.  There's sort
16  of a wide umbrella of different things that
17  could come up that I would handle.
18    Q.  All right.  In terms of hiring of
19  associates as you described earlier when you
20  were talking about staffing, what role did you
21  play as the ARM in the store with respect to
22  hiring?
23    A.  So it would kind of vary a little bit
24  store to store.  But, generally, I would do the

9 (Pages 30 - 33)

Page 34

1 first line of the interviewing. Um, and I like
2 to, um, talk with my department managers about
3 what they're comfortable with. So some
4 department managers would like to do the
5 interviewing and selecting on their own; some
6 would like me to do a prescreening of the
7 applicants and have that first interview and
8 then pass those applications on to them. I
9 think that was generally my practice in
10 Middleborough although it may have varied
11 during certain times of the year where a lot
12 more may have been on my plate. I may have
13 asked them to do, um, a little bit more of that
14 interviewing process. But generally I would be
15 a part of that, you know, looking at the
16 applications, selecting people that, um, I
17 thought would be good for interviews.
18 Sometimes that means, um, you know, if I was
19 looking for a certain department that had an
20 age requirement then I'm obviously going to get
21 rid of the applications that don't meet that
22 age requirement. And then I'll pass those
23 applications along, work with the department
24 manager to see who they might want to

Page 35

1 interview; bring in the person for the
2 interview, and then we can pass those
3 applications back on to the department manager
4 and ask them if they'd like to bring them in
5 for a second interview. Sometimes I also would
6 have them come in and just sit with them in the
7 moment if they were available to see if they
8 like them. And then they would let me know if
9 they would like to hire them. And then I would
10 proceed with the onboarding process, the
11 orientation, or scheduling the orientation.
12   Q. Were there ads that Hannaford used to
13 solicit applications for these different
14 positions?
15   A. Um, advertisements?
16   Q. Yeah.
17   A. Um, yes. They would sometimes do,
18 like, now hiring signs. So we would put those
19 around the store. And I believe the company as
20 a whole does their own advertising as well.
21   Q. Okay, that was my next question. With
22 respect to advertising the company does, did
23 you have any involvement wit that as ARM?
24   A. Um, I know during my time in

Page 36

1 Middleborough I don't believe so. Um, it was
2 more if I had been doing a staffing project I
3 may have advertised more than I typically would
4 if I were in one store. Um, but no, I don't
5 believe I had anything to do with any of the
6 kind of grander things. It would be more based
7 on my store. Um, putting up signs in my store
8 and advertising locally.
9   Q. Okay. When you were at Middleborough,
10 other than putting up signs in the store, did
11 you also advertise locally as you just put it?
12   A. Um, I don't recall. I know I may
13 have, um, spoken with the high school that was
14 down the street, um, to put up signs. Um, and
15 occasionally we would, um, have signs put up at
16 different libraries and things like that in the
17 area. But I don't recall specifics in
18 Middelborough if I did anything more than that.
19   Q. Okay. And then how was it determined
20 that a department needed an additional employee
21 or employees?
22   A. Um, generally that would be a
23 conversations that we'd have at department
24 manager meetings. I would check in with

Page 37

1 department managers about time and see if they
2 needed staffing. Um, and if they said they did
3 them I would get specifics from them, um, so
4 that I would know what to post for. Um, and
5 sometimes department managers would need
6 something prior to us meeting. So they would
7 come to me directly to let me know.
8   Q. And when you say you would know what
9 to post for, what do you mean by posting?
10   A. So we have a portal that we post for
11 different positions on.
12   Q. Okay. A portal where?
13   A. So there used to be the applicant
14 tracking system, which I believe is what we had
15 when I was in then Middleborough store. That
16 system no longer exists for us and we now use a
17 different system. But it was a website that we
18 would go to and post the open positions.
19   Q. Was it a Hannaford website or was it a
20 third party website?
21   A. I'm not sure. I believe it was third
22 party, but I'm not sure.
23   Q. Okay. So the idea was though that
24 people for jobs would see a posting on this

Page 38

1 website?
2     A.  I believe they had their, um, like
3 Hannaford had their website that they would go
4 to and apply from there, and it brought them to
5 whatever website that they would apply for,
6 yes.
7     Q.  Okay.  And when somebody applied for a
8 position who did the application go to?
9     A.  It would come to me if it was for my
10 store.
11     Q.  Okay.  And then what would you do with
12 that applications?
13     A.  I would look over it assess whether or
14 not that was a good fit for the position.
15     Q.  Okay.  And if you thought it was a
16 good fit what would you do next?
17     A.  Um, I would discuss it with the
18 department manager and see if they would like
19 to bring them in for an interview.  Or I would
20 bring them in for a prescreening interview that
21 I would do myself, and then discuss it with the
22 department manager.
23     Q.  Okay.  All right.  And for somebody
24 who kind of passed that prescreening, what

Page 39

1 would happen next in terms of the hiring
2 process?
3     A.  So I would usually collaborate with
4 the department manager at that point; talk with
5 them about how the interview went and ask them
6 if they would like to do a second interview.
7 Sometimes, depending on the situation, if the
8 department manager was available in the moment
9 and they had the time to sit with the person, I
10 would have them come in right after my
11 prescreening interview and they would interview
12 them on the spot.  Other times they would have
13 me reschedule it and they would do a second
14 interview.
15     Q.  Okay.  And for somebody then who was
16 continuing on in the process, what would happen
17 next?
18     A.  So, generally, I would have another
19 conversation with the department manager about
20 if.  And if they wanted to move forward with
21 hiring that applicant then I would usually
22 touch base with them, with the applicant, and
23 make a job offer; and at that point bring them
24 in and schedule their orientation.

Page 40

1     Q.  Okay.  And when you were extending job
2 offers how did you determine what the pay rate
3 would be in the offer?
4     A.  Um, I use the pay scale.
5     Q.  Okay.  When you say they pay scale
6 what do you mean by that?
7     A.  Hannaford has a pay scale and pay
8 guidelines that we use.
9     Q.  Okay.  All right.  And if the
10 candidate then accepted the offer what would
11 happen next?
12     A.  So that would generally be when I
13 would schedule the orientation.
14     Q.  Okay.  And can you describe what
15 happens during the orientation?
16     A.  Um, so I would go through the process
17 of putting them into the computer, into our
18 system using I-9 and PeopleSoft at the time -
19 which is a system that we used to use, but
20 we've not transitioned to a different one - and
21 would hire them, physical hire them in the
22 system.  And then I would also, um, go over
23 some baseline training for associates that, um,
24 kind of all our associates get in the very

Page 41

1 beginning.  So it would be some time spent with
2 them going over the basics, dress code policy,
3 um, some of the policies I mentioned earlier.
4 Um, and that would kind of be their welcome to
5 the company if you will.
6     Q.  Okay.  And with respect to the
7 orientation that you provided to associates,
8 how long did that last?
9     A.  Um, it would depend on the size of the
10 orientation.  Um, but it could vary anywhere
11 from an hour and a half to three hours.
12     Q.  When you say the size of the
13 orientation do you mean the number of people in
14 the group?
15     A.  Yes.
16     Q.  Okay.  All right.  And then after the
17 associate got that orientation from you what
18 would happen next in terms of their onboarding?
19     A.  Um, after that, um, the department
20 would, um, set up their training schedule with
21 them.  Um, so the department manager would give
22 them a call back with their training schedule.
23 And then they would generally schedule them
24 with a trainer in the department or maybe

11 (Pages 38 - 41)

1 side-by-side with themselves; and they would
2 work with that associate going over their
3 training packet.
4    Q.   Okay.  In terms of counseling or
5 disciplining of associates, what role did you
6 play?
7    A.   Um, I played an advisory role.  So if
8 a department manager would come to me with an
9 issue with an associate they would, you know,
10 bring me the information and I would make
11 recommends, um, performance counseling or
12 performance management.
13    Q.   Okay.  And did Hannaford have a
14 progressive disciplinary policy?
15    A.   Do you mean progressive steps?
16    Q.   Yes.
17    A.   Yes.
18    Q.   And can you describe what the steps
19 are?
20    A.   Generally, it would be a record of
21 conversation, um, which would usually happen
22 between the department manager and, um, the
23 associate.  It tends to be less serious; they
24 have a conversation about it.  Most of the time

1 they would recap it to me whether it be in an
2 e-mail.  Some department managers would write
3 that out on a coaching memo and just change the
4 wording to say record of conversation.  Um, but
5 they would get that back to me.  And then it
6 would move to a coaching memo which would be a
7 writing document that would be delivered, um,
8 to the associate.  And then it would move to a
9 step one, step two, and step three.  And then
10 step four is either discharged, um,
11 transferred, or, um, a demotion.
12    Q.   Okay.  And if an employee is being
13 discharged what's the process for that?
14          MR. GLASGOW:  Objection to form.
15    A.   It would, um, depend on the situation.
16 So it would depend if it was a voluntary or
17 involuntary termination.  They are handled
18 quite a bit differently.
19    Q.   Yes.  Let me ask about an involuntary
20 termination.  What's the process for an
21 involuntary termination?
22          MR. GLASGOW:  Objection to form.
23    A.   So, um, again, there's a lot of
24 variables.  But, I guess, generally, the

1 document, um, would be delivered by the store
2 manager, um, after, um, it really depends.  Are
3 you talking about the termination meeting
4 itself or?
5    Q.   So in terms of, first of all, the
6 decision to terminate an employee?  How does
7 that process proceed?
8    A.   Um, usually that would --
9          MR. GLASGOW:  Can I just
10       interject?  Are you just talking about
11       a frontline associate, Steve?
12          MR. CHURCHILL:  Yeah.
13          MR. GLASGOW:  I just want to make
14       sure we're clear who we're talking
15       about so I don't just keep objecting.
16          MR. CHURCHILL:  Yeah.
17    Q.   So say there's, like, a bakery
18 associate who's going to be terminated, how
19 would that process proceed?
20    A.   Okay.  So generally we would have gone
21 through the majority of the steps, unless it
22 was, like, a serious misconduct that would
23 bring us to that step sooner.  And we would
24 have a conversation with the department

1 manager.  Generally, the store manager is
2 involved as well.  And then the store manager
3 and I would discuss it, um, and we would reach
4 out to the associate relations specialist,
5 collect all the information.  Sometimes there's
6 an investigation involved depending on the
7 issue, and I would send off a step four request
8 for to the associate relations manager.  And
9 they would let us know what their
10 recommendation would be for the termination.
11 And then once that decision was made, um, then
12 we would, um, move forward with setting up that
13 termination meeting and the store manager
14 would, um, generally deliver that.
15    Q.   Okay.  So now for the termination
16 meeting itself, how would those meetings
17 typically proceed?  Who would participate and
18 play what roles?
19    A.   Um, so I wouldn't participate.  So not
20 physically being there I'm not sure exactly how
21 that would, um, go.  Um, but I know generally
22 the store manager and the department manager
23 sometimes would be involved in the actual
24 meeting.  Um, but again, I'm not in the room

1 when that happens, so I'm not exactly sure what
2 that looks like.
3    Q.  Okay.  Did you, as ARM, have any
4 involvement with the maintenance of the
5 personnel files?
6    A.  Yes.
7    Q.  And what was your involvement?
8    A.  So they're kept in cabinets in my
9 office, locked cabinets.  So I would do
10 tracking and things like that.
11    Q.  What do you mean by that?
12    A.  So if an associate were to call in I
13 would keep their, you know, sick file, um,
14 sick slips.  Um, I had personnel files, so any
15 of that information would be in there;
16 counseling steps, um, training files, things
17 like that.
18    Q.  All right.  I'm going to put some
19 documents up on the screen so we can talk about
20 them.
21        MR. CHURCHILL:  Can we go off the
22        record for just one second?
23        (Discussion off the record at
24 10:55 a.m.).

1    Q.  Can you see that, Ms. Nelson?
2    A.  Yes.
3    Q.  Okay.  So this is going to be
4 Exhibit 35.
5        (Exhibit No. 35, E-mail, is marked.)
6    Q.  The reference on the document, just
7 for everybody's understanding, where it says
8 Exhibit 17 that's because it was marked as
9 Exhibit 17 at Ms. Prinzo's deposition.  But for
10 our purposes it's going to be Exhibit 35.  So
11 just take a minute, if you can, and look at the
12 document and let me know if you need me to
13 scroll up or down?
14    A.  Um, can you scroll down, please?
15    Q.  (Indicating.)
16    A.  Is that the last page?
17    Q.  Yes.  It ends right there.  So these
18 are two e-mails from you to Ms. Prinzo, do you
19 see that?
20    A.  Yes.
21    Q.  They're from January of 2019?
22    A.  Yes.
23    Q.  And are these, would you describe
24 these as typical kinds of e-mails that you

1 would send to Ms. Prinzo about hiring
2 processes?
3        MR. GLASGOW:  Objection to form.
4    A.  I would say so.  I mean, they would
5 vary quite a bit, but yeah.  I think this is a
6 fairly typical interaction.
7    Q.  Okay.  Let me show you now what we're
8 going to mark as Exhibit 36.
9        (Exhibit No. 36, E-mail, is marked.)
10    Q.  You can see up there at the top this
11 is just a one page document.  It's just this
12 one e-mail, so I'll give you a chance to look
13 at that.
14        MR. GLASGOW:  What's the Bates
15        number, Steve, while she's looking at
16        it?
17        MR. CHURCHILL:  97322.
18        MR. GLASGOW:  Thanks.
19    Q.  Okay.  And do you recognize this as an
20 e-mail that you sent to Ms. Prinzo in August of
21 2018?
22    A.  Yes.
23    Q.  And also it relates to hiring for the
24 bakery department?

1    A.  Yes.
2    Q.  Okay.  And now I'm going to show you
3 what's going to be Exhibit 37, and this starts
4 with Bates No. 120870.
5    A.  Okay.
6        (Exhibit No. 37, E-mail, is marked.)
7    Q.  So this top e-mail says from
8 donotreply@delhaize; do you know who this comes
9 from?
10    A.  I believe it would have been me.  That
11 was a typical e-mail that would come from the
12 applicant tracking system if I were to forward
13 an application through the system.
14    Q.  Okay.  The e-mail goes on, but that
15 was my question if you knew who that came from.
16 I'm showing now what's going to be marked as
17 Exhibit 38.
18        (Exhibit No. 38, Hannaford Hiring
19 Toolkit, is marked.)
20    Q.  Do you recognize this document?
21    A.  Yes.
22    Q.  And as you can see it's titled hiring
23 toolkit, interview questions for hourly
24 positions, right?

Page 50

1   A.  Mm-hmm.
2   Q.  Did you use this document?
3   A.  Um, I, most of the time, would use the
4  associate relations manager document for first
5  interviewing.  I don't know the exact title of
6  it, but, um, we had one similar that was
7  specifically for the first screening interview.
8  This was generally used by department managers
9  for their second interview.  Sometimes it was
10 used by myself or the department manager.
11  Q.  All right.  Let me show you what will
12 be marked as Exhibit 39, and this is a one page
13 document.
14     (Exhibit No. 39, Massachusetts
15 Interview Questions about Convictions, is
16 marked.)
17  Q.  Do you recognize this form?
18  A.  Um, not necessary this particular
19 form, but I recognize it as the Massachusetts
20 interview questions about convictions, yes.
21  Q.  Okay.  And I understand the form as
22 filled out here may not be one you've seen
23 before, but the underlying form is one that
24 you've seen?

Page 51

1   A.  Yes.
2   Q.  Did you have any involvement in the
3  preparation of that form?
4   A.  The writing of that form?
5   Q.  Yes.
6   A.  No.
7   Q.  What was the purpose of this form?
8   A.  Um, it was something that, um, we used
9  as a company to ask, um, during the interview.
10 Um, it wouldn't stop us from hiring somebody,
11 but gives us some insight is about any previous
12 convictions.
13  Q.  And would this typically be filled out
14 by the ARM or by the department manager?
15  A.  Um, whoever was interviewing.
16  Q.  Okay.  We see, in this case, do
17 you recognize that as being Ms. Prinzo's
18 signature?
19  A.  Yes.
20  Q.  All right.  Let me show you, this is a
21 sixteen page document and it begins with
22 Hannaford 89537.  And I'll represent to you
23 that this was part of what was produced and
24 what was identified as personnel files for

Page 52

1  Ms. Prinzo's direct reports; just so you have
2  the context.  And this one appear to be to an
3  associate named Sydney Curpenski.  And I'm just
4  going, since there's sixteen pages, I'm just
5  going to flip through so you can see what's in
6  there generally.  I'm sure you've looked at a
7  number of these before.
8   A.  Okay.
9   Q.  Okay.  So is this the kind of
10 personnel file, as you described, you would
11 have kept in your office?
12  A.  Some of these things look like they
13 would have gone in the training file, but yes.
14  Q.  Okay.  So were there, other than
15 personnel files, were there other types of
16 files that were kept for employees?
17  A.  Yes.
18  Q.  What other files?
19  A.  Um, generally a training file and an
20 attendance file or, like, a sick file.
21  Q.  Okay.  And were those files kept in
22 paper or electric form?
23  A.  Paper form mostly.
24  Q.  And so going to, ah, first of all,

Page 53

1  let's mark this as Exhibit 40.
2     (Exhibit No. 40, Sydney Curpenski
3  Personnel File, is marked.)
4   Q.  And let's go to page sixteen.  And do
5  you recognize this document?
6   A.  It appears to be a job offer.
7   Q.  Okay.  And this is the stand form that
8  you used?
9   A.  Yes.
10  Q.  Okay.  And at the bottom we say it's
11 described as acceptance letter - hours/salaried
12 nonexempt - existing associate; do you see
13 that?
14  A.  Yes.
15  Q.  It says this is an offer letter that
16 would be used for somebody that is already
17 working at Hannaford?
18  A.  Um, generally, yes.
19  Q.  Okay.  Do you recognize any of the
20 handwriting on this document?
21  A.  Yes.  That looks like my handwriting.
22  Q.  Okay.  And then where it says offering
23 manager's signature, is that your signature?
24  A.  Yes.

1    Q.  All right.  I'm now showing you a two
2  page document which appears to be the personnel
3  file for Ashley Scales, and it starts with
4  Hannaford 89553.  And we'll mark this as
5  Exhibit 41.
6        (Exhibit No. 41, Ashley Scales
7  Personnel File, is marked.)
8    Q.  And if we go to page two do you
9  recognize this as another one of those offer
10  forms?
11    A.  Um, yes.  It does look like another
12  one of those offer forms.
13    Q.  Okay.
14    A.  This one looks like it's, um, a brand
15  new associate.
16    Q.  Right.  In fact, it says at the bottom
17  acceptance letter - hourly/salaried nonexempt -
18  new associate, right?
19    A.  Yes.
20    Q.  And do you recognize the handwriting
21  on the document?
22    A.  Yes, that's my handwriting.
23    Q.  And down where it says offering
24  manager's signature, that's your signature?

1    A.  Yes.
2    Q.  And for initial hourly rate of pay it
3  says... what's the amount?
4    A.  Um, it's hard to see.  It there a way
5  to zoom?
6    Q.  (Indicating.)
7    A.  It appears to say $12.25.
8    Q.  Okay.  And so that's an amount, a
9  rate, that you would come up with using what
10  you described as the pay scales?
11    A.  Yes.
12    Q.  Okay.  All right.  I'm showing you now
13  what we're going to mark as Exhibit 42.
14        (Exhibit No. 42, Sample Offer Letters,
15  is marked.)
16    Q.  This is just four different offer
17  letters.  Just to go through them, Vanessa,
18  Debbie, Isabella, and Emily.  So first of
19  all --
20        MR. GLASGOW:  What were the last
21  two names, Steve?
22        MR. CHURCHILL:  Isabella and
23  Emily.
24        MR. CHURCHILL:  Thanks.

1    Q.  So looking at page one do you
2  recognize the handwriting on this page?
3    A.  On which one?
4    Q.  On page one for Vanessa?
5    A.  Um, it's not my handwriting.  I'm
6  not... I can't be sure who's handwriting it
7  is.
8    Q.  Okay.  And as of the date on this,
9  which the offer date is 12-1-2020, you had
10  moved on from the Middleborough store and gone
11  onto Taunton, is that right?
12    A.  Yes.
13    Q.  Okay.  Do you recognize any of the
14  three signatures?
15    A.  Um, it's hard to say.  I can't be sure
16  who's they are.
17    Q.  Okay.  If you don't know that's fine.
18  You can say you don't know; that's why I was
19  asking.  Do you recognize any of the three
20  signatures?
21    A.  No.
22    Q.  Okay.  How about on page two for
23  Debbie Kelley?  Do you recognize any of those
24  three signatures?

1    A.  No.
2    Q.  Okay.  And on page three, again, this
3  is for Isabella Johnson.  Do you recognize any
4  of those three signatures?
5    A.  No.
6    Q.  And then finally on page four for
7  Emily Basset, do you recognize any of those
8  three signatures?
9    A.  That one looks a little bit more
10  clear.  It may be Alex Sweeney, but I can't be
11  sure.
12    Q.  Okay.  Let me show you what I'm going
13  to mark as Exhibit 43.  This is a 20 page
14  document that begins with Hannaford 89458.
15        (Exhibit No. 43, Pay Guidelines, is
16  marked.)
17    Q.  And I'll just go through this, flip
18  through it, so you can have a sense of what's
19  in there.  Well, there's table of contents so
20  you can just take a look at what's there.  Do
21  you recognize this document?
22    A.  Yes.
23    Q.  Is this a document that you used?
24    A.  Yes.

1    Q.   Okay.  And how did you use the
2 document?
3    A.   I used it as a guideline to inform,
4 um, pay decisions.
5    Q.   Okay.  And what was the purpose of
6 this document?
7    A.   Um, to help management make pay
8 decisions.
9    Q.   I'm going to show you the next
10 document which will be Exhibit 44.
11       (Exhibit No. 44, Pay Scale
12 Assignments, is marked.)
13   Q.   This is a six page document and some
14 of the items might be blank here because
15 they've been redacted which is something we do
16 in legal cases like this.  Sometimes the
17 attorneys will remove certain information for
18 different reasons.  So there may be that there
19 was other information there.  But if we go down
20 to page five do you recognize this document?
21   A.   It does look familiar, yes.
22   Q.   And what is it?
23   A.   Um, it looks to be part of the, um,
24 pay guidelines that we would have in our pay

1 scale book.
2    Q.   Okay.  When you say pay scale book,
3 what do you mean by that?
4    A.   Um, generally we would keep a physical
5 pay scale book with this information in it to
6 help us make offers.
7    Q.   Okay.  So just to look at the
8 specifics here, there's one columns that shows
9 the district and there's another column that
10 shows the store, do you see that?
11   A.   Yes.
12   Q.   And then the location name and then
13 the state, right?
14   A.   Yes.
15   Q.   And under the column hourly it says
16 MA 2; what does that refer to?
17   A.   I'm not sure.
18   Q.   Okay.  And then there's a column
19 that's entitled meat and then there's the
20 number three; do you know what that indicates?
21   A.   I don't, no.
22   Q.   Okay.  And then there's another column
23 that is entitled SAL/SNE; do you know what that
24 refers to?

1    A.   No.
2    Q.   Do you know what the number six refers
3 to in that column?
4    A.   No.
5    Q.   Okay.
6       MR. GLASGOW:  Steve, can you give
7    me the Bates number for Exhibit 44
8    real quickly?
9       MR. CHURCHILL:  Yeah, sorry.  It
10    starts with 89440.
11      MR. GLASGOW:  Thanks.
12   Q.   Let's now look at what we'll mark as
13 Exhibit 45 which is a one page document.  Bates
14 No. 89446.
15      (Exhibit No. 45, MA1 Retail Pay Scale,
16 is marked.)
17   Q.   Do you recognize this document?
18   A.   Yes.
19   Q.   What is it?
20   A.   Um, it appears to be the pay scale
21 that we used to use.  It's no longer a pay
22 scale, but it's what we used at the time.
23   Q.   Okay.  So is this what you would use
24 when you were determining what rate to put in

1 an offer letter?
2    A.   Yes.
3    Q.   Okay.  With respect to the levels that
4 are identified, like level one, level two,
5 level three, what do those refer to?
6    A.   Um, associates may be at different pay
7 levels dependent upon their role.
8    Q.   Okay.  So would the level be -- how
9 would you know what the level was for a
10 particular role?
11   A.   I don't recall exactly.  I think there
12 was another sheet somewhere in the, um, in the
13 pay book that would give us that information;
14 and you would reference the two against each
15 other.
16   Q.   Okay.  So just as an example, like a
17 bakery lead might be a level nine.  So if they
18 were full-time they would start at $12 an hour?
19   A.   Um, it would also... we would take a
20 look at their previous experience.  So we
21 wouldn't necessarily start them at the lowest
22 pay.
23   Q.   Okay.  So if we look at the second
24 column where it says step, what does that refer

16 (Pages 58 - 61)

1 to?
2    A.   So that would have referred to if we
3 had, um, an associate who started with us.
4 Then at that time we gave step increments.  So
5 after being with us for a certain amount of
6 time they would get a bump in pay if I'm not
7 mistaken.
8    Q.   All right.  Let me show you what we'll
9 mark as Exhibit 46.
10       (Exhibit No. 46, MA2 Bakery Employee
11 Pay Ranges, is marked.)
12    Q.   This is a three page document that
13 begins with Hannaford 89150.  Do you recognize
14 this document?
15    A.   Yes.  This looks like a more
16 up-to-date version of the pay scale.
17    Q.   Okay.  And is this a document that you
18 used?
19    A.   I believe so.
20    Q.   And this is a document that would have
21 been in what you described as the pay book?
22    A.   Yes, I believe so.
23    Q.   Where did you keep the pay book?
24    A.   Um, it was locked away in one of the

1 filing cabinets in my office.
2    Q.   And why was it locked away?
3    A.   Um, just for safekeeping.
4    Q.   Did anyone else have the pay book in
5 the store?
6    A.   Um, I'm not sure if anyone else had a
7 copy.  I don't know if the store manager did,
8 maybe.
9    Q.   Okay.  So looking at this page here,
10 page one, you see there's a job code 333,
11 part-time baker?
12    A.   Yes.
13    Q.   And then there's, if you look over to
14 the right, there's a minimum, midpoint,
15 maximum, and then a few levels in between those
16 do you see that?
17    A.   Yes.
18    Q.   So how would you determine what rate
19 to put into an offer letter?
20    A.   Um, so I would think about their
21 previous experience whether it was relevant to
22 retail, um, or if they performed similar job
23 duties at a previous position.  And I would,
24 um, review that, um, with this document along

1 with the pay guidelines, um, and review that
2 information to determine an accurate rate.  Um,
3 sometimes we would also look at where other
4 associates who were in the role were to be sure
5 we were as fair and consistent as possible.
6    Q.   Okay.  And once you decided on a rate
7 did you have to get the store manager's
8 approval?
9    A.   Um, I would generally talk it over
10 with them, yes.
11    Q.   Okay.  I'm showing you what we're
12 going to mark as Exhibit 47.
13       (Exhibit No. 47, Manager Salary
14 Levels, is marked.)
15    Q.   Do you recognize this document?
16    A.   Yes.
17    Q.   And did you also use this document?
18    A.   Um, rarely.  But yes, sometimes I
19 would.  Um, I would assist with the sore
20 manager making offers.  If he needed
21 information from the this document I'd provide
22 it.
23    Q.   Okay.  And was this also in the pay
24 book?

1    A.   Yes.
2    Q.   Okay.  All right.
3       MR. CHURCHILL:  Why don't we take
4    a quick bathroom and rest break.
5       (Discussion off the record at
6 11:21 a.m.).
7       (Recess at 11:21 a.m.)
8    Q.   All right.  Let me share my screen
9 again.  I'm showing you a document entitled
10 Hannaford Onboarding Module Training Aids.
11 This is a 72 page document that begins at
12 Hannaford 85071.  Let me just scroll down a few
13 pages.  I'll go to page five which is the table
14 of contents so you can see what's in here.  Do
15 you recognize this document?
16    A.   Yes.
17    Q.   What is it?
18    A.   Um, it's something that we would use
19 during orientation onboarding.
20    Q.   Okay.  And who used this document
21 during orientation?
22    A.   Um, the ARMs.
23    Q.   Okay.  And how would you use the
24 document?

Page 66

1    A.   Um, so we would use it to go over
2  information with the associate, the new
3  associate.
4    Q.   Why don't we mark this as Exhibit 48.
5        (Exhibit No. 48, Hannaford Onboarding
6  Module Training Aids, is marked.)
7    Q.   Let me show you the next document
8  which will be Exhibit 49.
9        (Exhibit No. 49, New Hire Orientation
10  Script, is marked.)
11    Q.   And this is a 21 page document that
12  begins with Hannaford 84987.  Do you recognize
13  this document?
14    A.   Yes.
15    Q.   And what is it?
16    A.   It's a new hire orientation script.
17    Q.   Okay.  Is this something that, well,
18  what was the purpose of this document?
19    A.   Um, it was to aid the associate
20  relations manager in speaking with the new
21  associates during the orientation.
22    Q.   Okay.  And I'll show you a 13 page
23  document entitled retail onboarding facilitator
24  guide.  And this is a 13 page document that

Page 67

1  begins at Hannaford 85336.  Do you recognize
2  this document?
3    A.   Yes.
4    Q.   And what was the purpose of this
5  document?
6    A.   Can I see the following page, the
7  table of contents?
8    Q.   Yeah, that's page two.  (Indicating.)
9    A.   So this looks like it was, again,
10  utilized as a guide for associate relations
11  managers during onboarding.
12    Q.   Okay.  And we'll mark this as
13  Exhibit 50.
14        (Exhibit No. 50, Retail Onboarding
15  Facilitator Guide, is marked.)
16    Q.   Let's go back to what we had marked as
17  Exhibit 40 which is the, um, what appears to be
18  a file for Sydney Curpenski.  One page one here
19  there's a document entitled Coaching Memo
20  Re:  Short/Missed Meals or Breaks; do you see
21  this?
22    A.   Yes.
23    Q.   And is this a form that was used in
24  Middleborough?

Page 68

1    A.   Yes.
2    Q.   And was it also used in other stores?
3    A.   Yes.
4    Q.   Okay.  And what's at purpose of the
5  form?
6    A.   To inform them of a break or meal
7  violation to inform the associate.
8    Q.   Okay.  And is this the kind of issue
9  that you would flag for department managers
10  during your daily review of pay roll records?
11    A.   Yes.  That would be something that I
12  would do throughout the week and they would
13  generally get these on Sunday from me.
14    Q.   On the what?  You said you would
15  generally get these on Sunday?
16    A.   Yes.  I would keep track of them
17  throughout the week, and then on Sunday when I
18  would do payroll, um, I would give these to the
19  department manager to be delivered to their
20  associates.
21    Q.   I see.  So did you actually, you
22  prepared the form give and then give it to the
23  department manager?
24    A.   Um, I would included form with, um, a

Page 69

1  weekly timecard sheet where we tracked the
2  violations.  And I would generally give them an
3  empty form, and they would know based off of
4  the other sheet who would need the
5  documentation.
6    Q.   I see.  And if we go to page two of
7  this exhibit.  I'll rotate that so you can see
8  it.  This is a form entitled supervisor's
9  call-in report; do you see that?
10    A.   Yes.
11    Q.   And is this a form that's used in used
12  in, well, this is certainly used in
13  Middleborough, right?
14    A.   Yes.
15    Q.   Is it also used in other stores?
16    A.   Yes.
17    Q.   And what's the purpose of this one?
18    A.   Um, to let us know, um, if the
19  associate had left early, was out for a shift,
20  or was tardy.
21    Q.   Okay.  And so this was a form that the
22  supervisor would fill out and then submit to
23  the ARM?
24    A.   Um, generally the supervisor.

18 (Pages 66 - 69)

Page 70

1 Sometimes it was whoever was taking the phone
2 call, but generally the supervisor or the
3 assistant department manager, yes.
4    Q.   Okay.  And the form was supposed to be
5 forwarded to the store's ARM?
6    A.   Yes.
7    Q.   And then it would go in the personnel
8 file?
9    A.   Yes.  The sick file, yes.
10    Q.   I'm showing you another copy of the
11 supervisor call-in report, and this one we'll
12 mark as Exhibit 51.
13       (Exhibit No. 51, Supervisor Call-In
14 Report, is marked.)
15    Q.   With respect to the handwriting in the
16 upper right that says four protected, do you
17 recognize that handwriting?
18    A.   I am not sure who's handwriting that
19 is, no.
20    Q.   Do you know what four protected refers
21 to?
22    A.   Um, it likely is pertaining to the
23 amount of hours of protected sick time being
24 used.

Page 71

1    Q.   I see.  Now showing it's a five page
2 document which, again, Hannaford 122329.  And
3 this we'll mark as Exhibit 52.
4       (Exhibit No. 52, Weekly Timecard
5 Violations, is marked.)
6    Q.   Do you recognize this?  Let me just
7 scroll through.  So it's five pages of what are
8 titled weekly timecard violations.  Do you
9 recognize this form?
10    A.   Yes.
11    Q.   And what is the purpose of the form?
12    A.   Um, to track associate missed breaks,
13 missed lunches, short breaks, short lunches,
14 um, and any missed punches that they may have
15 had throughout the week with.
16    Q.   Okay.  And is this a form that you
17 used?
18    A.   Yes.
19    Q.   Okay.  And describe for me how the
20 form was used?
21    A.   So I would write in the associate's
22 name, the date that the violation took place,
23 and then what the violation was.  And then in
24 parenthesis I would generally write, um,

Page 72

1 whether or not it would need a coaching memo.
2 So if it needed a coaching memo I would write
3 see memo.  Um, on the bottom for missed punches
4 I would write in their name, the date, and, um,
5 what the punch was that they were missing and
6 what time it was missing.
7    Q.   Okay.  And what would you do with the
8 form?
9    A.   So at the beginning of the following
10 week when we processed payroll for the previous
11 week it would go to the department manager or
12 assistant department manager, whoever was doing
13 payroll for the department that day.  Um, and
14 they would review the form and sign off that
15 the information looked correct.  So if there
16 was any missed punches, um, that they had
17 questions on we would review that and they
18 could question that.  But they generally signed
19 it to verify that the information on the form
20 was correct.  Um, and I would also attach those
21 blank coaching memos that you had shown
22 previously, um, so that they would be able to
23 fill those out and deliver them to the
24 associates who, um, had policy violations.

Page 73

1    Q.   Okay.  All right, I'm showing you next
2 what we'll mark as Exhibit 53 and this is a one
3 page document.  That's Hannaford 89586.
4       (Exhibit No. 53, Coaching Memo, is
5 marked.)
6    Q.   Do you recognize this document?
7    A.   Yes.
8    Q.   And what was the purpose was this
9 form?
10    A.   Um, this form was for violations of
11 the attendance and punctuality, um, in
12 particular tardies.
13    Q.   Okay.  And how was this form
14 generated?
15       MR. GLASGOW:  Objection to form.
16    A.   I'm not sure.  Um, it was something
17 available for ARMs to utilize.  It wasn't
18 anything that I came up with myself or anything
19 like that.
20    Q.   Okay.  So it seems to indicated at the
21 time this was something that was used
22 throughout Hannaford?
23    A.   Yes.
24    Q.   Okay.  And how would you determine

Page 74

1  when somebody had a tardiness that needed to be
2  addressed?
3      A.  Um, if the department had given me the
4  supervisory call-in slip and had marked them
5  tardy.  Um, it kind of lists here what would of
6  constitute a tardy.  So if they had three or
7  more breaks, um, twenty minutes or more on a
8  payroll period.  So that's something that I
9  would catch on the weekly timecard sheets.  Um,
10  or if they were ten minutes or more tardy to a
11  scheduled shift that would generally be
12  something that the department manager or the
13  assistant department manager would make me
14  aware of via those call-in reports.  And then
15  if they had left early for a scheduled shift
16  having completed more than fifty percent of the
17  shift.  And, again, that would be something
18  that they would notify me of using those
19  supervisor call-in reports.
20     Q.  Okay.  So you would prepare these
21  forms based on that information?
22     A.  I would generally give the form.  Um,
23  sometimes I would type in the dates there of
24  the information or give the information to the

Page 75

1  department manager in an e-mail, um, saying,
2  um, that so-and-so had this violation of the
3  tardy policy and, um, what date and for how
4  long; and then give them that information on
5  when they would need to be tardy free until,
6  and then provide the blank document for them to
7  fill in.
8      Q.  Okay.  And the document would be
9  provided to the employee?
10     A.  By the department manager, yes.
11     Q.  And then a copy of it would go into
12  the personnel file?
13     A.  Yes.
14     Q.  I'm showing you what we'll mark as
15  Exhibit 54.  And this is a one page document.
16  It was marked as Exhibit 58 at Ms. Prinzo's
17  deposition which is why that sticker's on
18  there.  It's Hannaford 99369.  Just take a
19  minute, if you can, and familiarize yourself
20  with the e-mail and let me know when you're
21  ready.
22     A.  Okay.
23     Q.  And do you recognize this as an
24  example of a record of conversation?

Page 76

1      A.  Yes.
2      Q.  And under Hannaford's policy, when a
3  department manager had a coaching conversation
4  like this with an employee, it was supposed to
5  be documented and sent to the ARM?
6      A.  Um, generally, yes.
7      Q.  Okay.  And then a document of the
8  document would go in the employee's personnel
9  file?
10     A.  Um, sometimes I would keep that record
11  in my e-mail as a reference; but sometimes yes,
12  it would be printed and put in the file.
13     Q.  Okay.  We'll mark this as Exhibit 55.
14  I'm sorry this is 54.
15         (Exhibit No. 54, E-mail, is marked.)
16     Q.  I'm showing now a two page form.  This
17  would be exhibit 55.  And this a document
18  that was marked as an Exhibit at Ms. Prinzo's
19  deposition.  It begins at Hannaford 90175.
20         (Exhibit No. 55, Performance
21  Counseling Form, is marked.)
22     Q.  And you recognize this as a
23  performance counseling form that was used
24  throughout Hannaford?

Page 77

1      A.  Yes.
2      Q.  And you testified early about the
3  different steps of the disciplinary process and
4  you see those steps are reflected here under
5  where it says type of counseling?
6      A.  Yes.
7      Q.  All right.  And these documents, when
8  they were completed, would go into an
9  employee's personnel file?
10     A.  Yes, and a counseling folder.
11     Q.  All right.  I'm pretty much ready to
12  wrap up.  Let me just take a break so I can
13  review my notes and any documents I have.  So
14  why don't we come back at noon.  I'm likely
15  done, but just give me a chance to look through
16  and if I have any brief follow-up questions
17  I'll ask them then and then we can let you go,
18  all right?
19     A.  All right.
20         (Recess at 11:50 a.m.)
21         MR. CHURCHILL:  I don't have any
22     further questions, Ms. Nelson.  Thanks
23     for your time.
24         THE WITNESS:  Thank you.

20 (Pages 74 - 77)

Page 78

1          MR. GLASGOW:  We don't have any
2   questions either.  Ms. Nelson will
3   read and sign.
4          THE COURT REPORTER:  Attorney
5   Ryan, would you like a copy of the
6   transcript?
7          MR. GLASGOW:  Yes, please.
8          (Whereupon the Deposition has been
9   Adjourned at 12:01 p.m.).
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 80

1      SHEET DISTRIBUTION INFORMATION
    DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
2
3      ERRATA SHEET DISTRIBUTION INFORMATION
4      The original of the Errata Sheet has
5   been delivered to RYAN GLASGOW, Esquire.  When
6   the Errata Sheet has been completed by the
7   deponent and signed, the ORIGINAL should be
8   retained by STEPHEN CHURCHILL, Esquire, to whom
9   the original deposition transcript was
10  delivered.
11
12         INSTRUCTIONS TO DEPONENT
13      After reading this volume of your
14  deposition, please indicate any corrections or
15  changes to your testimony and the reasons
16  therefor on the Errata Sheet supplied to you
17  and sign it.  DO NOT make marks or notations on
18  the transcript volume itself.  Add additional
19  sheets if necessary.  Please refer to the above
20  instructions for the Errata Sheet distribution
21  information.
22
23
24

Page 79

1          COMMONWEALTH OF MASSACHUSETTS
2   NORFOLK, ss.
3          I, ANGELA CAKRIDAS, a Professional
    Court Reporter and Notary Public in and for the
4   Commonwealth of Massachusetts, do hereby
    certify that, CHELSEA NELSON, the witness whose
5   deposition is herein set forth and remotely
    appeared, was identified and duly sworn by me
6   and that such deposition is a true record of
    the testimony given by the witness on
7   January 12, 2022, to the best of my ability.
8          I further certify that I am neither
    attorney or counsel for, nor related to or
9   employed by, any of the parties to the action
    in which this deposition is taken, and further,
10  that I am not a relative or employee of any
    attorney or counsel employed by the parties
11  hereto or financially interested in the action.
12
         My Commission Expires:  March 13, 2026
13
14
15         Angela M. Cakridas
           Court Reporter
16         Notary Public
17
18
19
20
21
22
23
24

Page 81

1 ATTACH TO THE DEPOSITION OF CHELSEA NELSON
2 DATE TAKEN:  January 12, 2022
3 CASE:  1:21-cv-11901-WGY
4          ERRATA SHEET
5 PAGE   LINE      CHANGE        REASON
6
7
8
9
10
11
12      I certify that I have read the
13  foregoing transcript of my testimony given on
14  January 12, 2022, and except for any
15  corrections or changes noted above, I hereby
16  subscribe to the transcript as an accurate
17  record of the statements made by me.
18
19      SIGNED UNDER THE PAINS AND PENALTIES
20  PERJURY, and executed this    day of      ,
21  2022.
22
23          CHELSEA NELSON
24

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.