UNITED STATES DISTRICT COURT
FOR DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JUDITH PRINZO, on behalf of herself and all other employees similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> HANNAFORD BROS. CO., LLC, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )    CIVIL ACTION NO.  1:21-cv-11901 |

**DEFENDANT'S OPPOSITION TO
<u>PLAINTIFF'S MOTION FOR CLASS CERTIFICATION</u>**

### TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................................iii

TABLE OF EXHIBITS .................................................................................................. vi

I.     INTRODUCTION ................................................................................................. 1

II.    THE COURT MUST PERFORM A "RIGOROUS ANALYSIS" TO ENSURE PLAINTIFF HAS SATISFIED ALL OF THE REQUIREMENTS OF RULE 23. ........................................... 2

III.   THE LEGAL CLAIMS IN THIS CASE REQUIRE AN INDIVIDUALIZED ANALYSIS OF EACH PUTATIVE CLASS MEMBER'S "PRIMARY DUTY." ........................ 3

IV.   SUMMARY OF THE EVIDENCE ...................................................................... 6

    A.   Plaintiff's Class Includes Seven Different Manager-Level Positions................................ 6

    B.   Hannaford Expects its Department Mangers To Be Primarily Responsible for Managing Their Departments. ........................................................................................ 7

    C.   Plaintiff's Own Claims Preview The Fact-Intensive Analysis Required For Each Putative Class Member. ................................................................................................ 8

    D.   Plaintiff Has Not Offered Any Common Proof That Obviates A Plaintiff-By-Plaintiff Inquiry. .................................................................................................. 11

        1.   Hannaford's training aids and standard practices are designed to help department managers—not dictate how department managers perform their job. .............................. 11

        2.   The "labor standards" cannot be used to determine the amount of time that department managers spend performing exempt vs. non-exempt tasks. .................................. 13

        3.   The weekly scheduling process highlights the discretion each "fresh department manager" has to schedule their associates and themselves as they see fit........................... 15

V.    PLAINTIFF'S PROPOSED CLASS DOES NOT SATISFY THE REQUIREMENTS OF RULE 23(A)(2) OR (B)(3). ......................................................................................... 16

VI.   CONCLUSION............................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Express Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013)........................................................................................................3

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)......................................................................................................16

*Benedict v. Hewlett-Packard Co.*,
  314 F.R.D. 457 (N.D. Cal. Apr. 8, 2016)....................................................................18

*Burke v. Mgm't. & Training Corp.*,
  No. 3:16-CV-00152-NBB-JMV, 2018 WL 4038115 (N.D. Miss. Aug. 23,
  2018) ............................................................................................................................20

*Chavez v. Lumber Liquidators, Inc.*,
  No. CV-09-4812 SC, 2012 WL 1004850 (N.D. Cal. Mar. 26, 2012)..........................5

*Crowe v. Examworks, Inc.*,
  136 F. Supp. 3d 16 (D. Mass. 2015) ...........................................................................4

*DaRosa v. Speedway, LLC*,
  557 F. Supp. 3d 315 (D. Mass. 2021) ..........................................................................5

*Faraji v. Target Corp.*,
  NO. 5:17-CV-00155-ODW-SP, 2018 WL 2041380 (C.D. Cal. Apr. 30, 2018).........5

*Gardner v. Western Beef Properties, Inc.*,
  NO. 07-CV-2345, 2011 WL 6140518 (E.D.N.Y. Sept. 26, 2011) .............................18

*Grandy v. RWLS, LLC*,
  No. 17-588 JCH/CG, 2019 WL 1407214 (D.N.M. Mar. 28, 2019)......................5, 19

*Marzuq v. Cadete Enter., Inc.*,
  807 F.3d 431 (1st Cir. 2015).................................................................................19, 20

*Mike v. Safeco Ins. Co. of Am.*,
  274 F. Supp. 2d 216 (D. Conn. 2003)...........................................................................5

*Morrison v. Ocean State Jobbers, Inc.*,
  290 F.R.D. 347 (D. Conn. 2013)..................................................................................18

*Motor Vehicles Canadian Exp. Antitrust Litig.*,
  552 F.3d 6 (1st Cir. 2008).............................................................................................3

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d. Cir. 2010)..................................................................................4, 18

*In re Nexium Antitrust Litig.*,
   777 F. 3d 9 (1st Cir. 2015).............................................................................................3

*Novak v. Home Depot, Inc.*,
   259 F.R.D. 106 (D.N.J. 2009)......................................................................................19

*Parent/Professional Advocacy League v. City of Springfield*,
   934 F. 3d 13 (1st Cir. 2019).........................................................................................16

*Patel v. Nike Retail Servs., Inc.*,
   No. 14-CV-04781-RS, 2016 WL 1241777 (N.D. Cal. Mar. 29, 2016) .................................4, 5

*Patton v. Dollar Tree Stores, Inc.*,
   No. CV-15-03813-MWF, 2017 WL 8233911 (C.D. Cal. Feb. 7, 2017)...........................5, 18

*Quiles v. Wal-Mart Stores, Inc.*,
   No. 16-9479, 2020 WL 1969940 (D.N.J. Apr. 24, 2020).........................................................5

*Raposo v. Garleick Farms*,
   293 F.R.D. 52 (D. Mass. 2013)..................................................................................2, 3

*Rea v. Michaels Stores, Inc.*,
   No. SACV-13-455-GW, 2014 WL 1921754 (C.D. Cal. May 8, 2014).....................................5

*Romulus v. CVS Pharmacy, Inc.*,
   321 F.R.D. 464 (D. Mass. 2017)................................................................................3, 16

*Rooney v. Town of Groton*,
   577 F. Supp. 2d 513 (D. Mass. 2008) ......................................................................19

*Scott v. Chipotle Mexican Grill, Inc.*,
   954 F.3d 502 (2d Cir. 2020).................................................................................4, 5, 17

*Swank v. Wal-Mart Stores, Inc.*,
   No. 2:13-CV-1185, 2018 WL 2684102 (W.D. Pa. June 5, 2018) .....................................5, 18

*Taha v. City of Bucks*,
   862 F.3d 292 (3d Cir. 2017).........................................................................................16

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016)......................................................................................................16

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)..........................................................................................2, 3, 16, 17

iv

*Walker v. Osterman Propane, LLC*,
    411 F. Supp. 3d 100 (D. Mass. 2019) ...................................................................................16

**Statutes**

454 Mass. Code Regs. 27.03(3) .............................................................................................3, 4

M.G.L. c. 136, § 16 ...................................................................................................................3

M.G.L. c. 151, § 1A(3) .............................................................................................................3

**Other Authorities**

29 C.F.R. § 541.100 ..................................................................................................................4

29 C.F.R. § 541.200 ..................................................................................................................4

29 C.F.R. § 541.700 ............................................................................................................4, 19

29 C.F.R. § 541.708 ..................................................................................................................4

Fed. R. Civ. P 23(a) ........................................................................................................1, 2, 3, 16

Fed. R. Civ. P. 23(b) ......................................................................................................1, 2, 3, 16

**TABLE OF EXHIBITS**[1]

| EXHIBIT | CONTENTS |
|---------|----------|
| Exhibit A | Defendant's First Amended and Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories, dated October 13, 2021. |
| Exhibit B | Declaration of Andrea Nickerson, executed on September 1, 2022.<br><br>Exhibit 1:  Job descriptions.<br><br>Exhibit 2:  Performance review template. |
| Exhibit C | Excerpts of Deposition Transcript for Plaintiff Judith Prinzo, dated October 27, 2021.<br><br>Deposition Exhibits included:<br><br>Exhibit 17:  Email chain between Plaintiff and Associate Relations Manager discussing interviews, dated January 25, 2019.<br><br>Exhibit 18:  Email to Plaintiff from Associate Relations Manager discussing interviews, dated August 15, 2018.<br><br>Exhibit 19:  Email to Plaintiff from Associate Relations Manager discussing an applicant, dated October 5, 2018.<br><br>Exhibit 20:  Hannaford's Hiring Toolkit.<br><br>Exhibit 21:  Hannaford's Hiring Toolkit, with handwritten notes.<br><br>Exhibit 22:  Plaintiff's notes from interview with applicant, dated May 23, 2017.<br><br>Exhibit 25:  Plaintiff's 2018 Annual Performance Evaluation, dated March 22, 2019.<br><br>Exhibit 26:  Plaintiff's 2017 Annual Performance Evaluation, dated March 13, 2018.<br><br>Exhibit 27:  Annual Performance Evaluation for Plaintiff's direct report, dated March 6, 2020.<br><br>Exhibit 28:  Annual Performance Evaluation for Plaintiff's direct report, dated March 16, 2019. |

---

[1] Exhibits cited herein are attached to the Declaration of Christopher M. Pardo in Support of Defendant's Opposition to Plaintiff's Motion for Class Certification, filed herewith.

| EXHIBIT | CONTENTS |
|---------|----------|
| Exhibit C | Exhibit 29:  Annual Performance Evaluation for Plaintiff's direct report, dated March 15, 2019. |
| | Exhibit 30:  Annual Performance Evaluation for Plaintiff's direct report, dated March 5, 2020. |
| | Exhibit 31:  Annual Performance Evaluation for Plaintiff's direct report, dated March 16, 2019. |
| | Exhibit 32:  Annual Performance Evaluation for Plaintiff's direct report, dated October 20, 2019. |
| | Exhibit 33:  Annual Performance Evaluation for Plaintiff's direct report, dated March 10, 2019. |
| | Exhibit 35:  45/90 Day Performance Appraisal for Plaintiff's direct report. |
| | Exhibit 36:  45/90 Day Performance Appraisal for Plaintiff's direct report. |
| | Exhibit 37:  Bakery Scheduling Audits, dated August 11, 2018. |
| | Exhibit 40:  Plaintiff's 2019 Manager On Duty Hours. |
| | Exhibit 43:  Supervisor's Call-In Report completed by Plaintiff, dated August 23, 2017. |
| | Exhibit 44:  Supervisor's Call-In Report completed by Plaintiff, dated December 3, 2017. |
| | Exhibit 45:  Supervisor's Call-In Report completed by Plaintiff , dated September 18, 2020. |
| | Exhibit 46:  Plaintiff's text messages with direct report discussing scheduling, dated October 27, 2020. |
| | Exhibit 47:  Plaintiff's text messages with direct report discussing scheduling, produced by Hannaford in this action . |
| | Exhibit 48:  Completed Training Guide for Plaintiff's direct report, dated April 17, 2017. |
| | Exhibit 49:  Completed Training Guide for Plaintiff's hourly employee, dated July 19, 2017. |
| | Exhibit 50:  Completed Training Guide for Plaintiff's hourly employee, dated November 20, 2018. |

| EXHIBIT | CONTENTS |
|---|---|
| Exhibit C | Exhibit 53:  Plaintiff's 2019 Annual Performance Evaluation, dated March 6, 2020.<br><br>Exhibit 54:  Plaintiff's email to Associate Relations Manager discussing employee disciplinary issue, dated August 6, 2019.<br><br>Exhibit 55:  Email chain between Plaintiff and Associate Relations Manager discussing employee disciplinary issue dated July 26, 2019.<br><br>Exhibit 56:  Plaintiff's email to Associate Relations Manager discussing employee disciplinary issue, dated February 6, 2020.<br><br>Exhibit 57:  Plaintiff's email to Associate Relations Manager discussing employee disciplinary issue, dated September 26, 2022.<br><br>Exhibit 58:  Plaintiff's email to Associate Relations Manager discussing employee disciplinary issue, dated July 30, 2019.<br><br>Exhibit 59:  Plaintiff's direct report's Performance Counseling Form, dated August 15, 2019.<br><br>Exhibit 60:  Plaintiff's email to Associate Relations Manager discussing employee disciplinary issue, dated August 28, 2018.<br><br>Exhibit 61:  Plaintiff's email to Associate Relations Manager discussing employee disciplinary issue, dated March 19, 2019.<br><br>Exhibit 62:  Plaintiff's email to Associate Relations Manager discussing employee disciplinary issue, dated October 9, 2018.<br><br>Exhibit 63:  Plaintiff's email to Associate Relations Manager discussing employee disciplinary issue, dated November 6, 2020.<br><br>Exhibit 64:  Plaintiff's email to direct report discussing disciplinary issue, dated January 21, 2020. |
| Exhibit D | Declaration of Jeremy Stevens, executed on September 1, 2022.<br><br>Exhibit A:  Fixed activities report for the Bakery Department at Hannaford's Middleboro, MA store.<br><br>Exhibit B:  Hours transfer report for Plaintiff.<br><br>Exhibit C:  Text messages |
| Exhibit E | Excerpts of Deposition Transcript for Jeremy Stevens, dated October 19, 2021. |

| EXHIBIT | CONTENTS |
|---|---|
| Exhibit F | Declaration of Lisa Pultar, executed on August 30, 2022. |
| Exhibit G | Declaration of Mark Bernal, executed on August 31, 2022. |
| Exhibit H | Declaration of Steven (Steve) Hebert, executed on August 31, 2022. |
| Exhibit I | Declaration of William (Bill) Gavazzi, executed on August 31, 2022. |
| Exhibit J | Declaration of April Smith, executed on September 1, 2022. |

## I.      INTRODUCTION

Whether analyzed under Rule 23(a)(2)'s "commonality" requirement or Rule 23(b)(3)'s "predominance" requirement, Plaintiff's exemption misclassification claim cannot be resolved on a class-wide basis for all 116-plus putative class members in "one stroke."  Accordingly, Plaintiff's motion fails the "rigorous analysis" required by Rule 23.

Plaintiff stumbles out of the gate by incorrectly claiming that she seeks to represent a class of "fresh department managers."  No such position exists.  Instead, Plaintiff's "fresh department manager" class definition encompasses *seven different exempt positions*—each with their own distinct responsibilities.   Plaintiff's efforts to lump these positions together ignores these fundamental differences and is the result of her recognition of the extreme deviations among the even broader class of *all* "Department Managers" she originally sought to represent in this case.

Plaintiff acknowledges that the "primary duty" analysis at the heart of this case turns on "what department managers do . . . and how long it takes them to do it."  Pl.'s Br. at 15.  But determining "what department managers do . . . and how long it takes to do it" requires an analysis of each putative class member's *actual* duties.  Try as she may, Plaintiff offers no plan or road map for how this issue could be decided on a class-wide basis.  Indeed, the modicum of so-called "common evidence" that Plaintiff offers—namely, various training aids and other corporate resources—is barely even relevant (if at all) to the "primary duty" analysis and certainly fails to shed much, if any, light on what each of the putative class members actually does on a daily basis.

The evidence that *should* be in Plaintiff's motion, *but is missing*, is the most telling.  Even though the motion is premised on the contention that she can represent a class comprised of seven different positions, Plaintiff does not cite to a single line of her deposition—*not even once*.  Whatever else can be made of Plaintiff's silence, one thing is clear:   Plaintiff has no factual (or other) basis to claim that her own experience is representative of any other putative class member.

Plaintiff only worked in a *single* position, in a *single* store, during the relevant time period, and she has exhibited no first-hand knowledge of how any other putative class member did their jobs.

Frankly, it is questionable whether Plaintiff genuinely believes the overly simplistic picture of her former job that she now tries to paint in her brief. She testified at length at her deposition about performing a wide range of exempt, managerial duties—including (i) supervising approximately 10 direct reports, (ii) making hiring and other staffing decisions, and (iii) overseeing and directing all operations in her department, to name a few. Though she now ignores her own testimony, Plaintiff's deposition transcript and the 70-plus exhibits introduced during her deposition provide a painstaking preview of the detailed, fact- and document-intensive inquiry that will have to be performed for each putative class member in order to answer the "primary duty" question. That type of analysis would turn this supposed class action on its head.

In sum, the "primary duty" analysis cannot be performed in a vacuum or based on theory. It will turn, instead, on the *actual* job duties and responsibilities performed by Plaintiff and each member of the putative class. Plaintiff has not offered any legitimate (let alone manageable) way to make this determination on a class-wide basis, and her Motion should be denied.

## II.   THE COURT MUST PERFORM A "RIGOROUS ANALYSIS" TO ENSURE PLAINTIFF HAS SATISFIED ALL OF THE REQUIREMENTS OF RULE 23.

A "class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979)). Under Rule 23, "a court may certify a class only if it finds that the proposed class satisfies all of the requirements of Rule 23(a) and that class-wide adjudication is appropriate for one or more reasons set forth in Rule 23(b)." *Raposo v. Garleick Farms*, 293 F.R.D. 52, 54 (D. Mass. 2013).

As the Supreme Court has explained, "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate compliance with the Rule." *Dukes*, 564 U.S. at 350; *see also Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 229 (2013) ("[Rule 23] imposes stringent requirements for certification that in practice exclude most claims."). Thus, the "district court must undertake a '*rigorous analysis*' to determine whether plaintiffs [have] met the four threshold requirements of Rule 23(a) (numerosity, commonality, typicality, and adequacy of representation) and Rule 23(b)(3)'s two additional prerequisites." *See In re Nexium Antitrust Litig.*, 777 F. 3d 9, 18 (1st Cir. 2015) (emphasis added).

This rigorous analysis "will frequently entail overlap with the merits of the plaintiff's underlying claim." *Romulus v. CVS Pharmacy, Inc.*, 321 F.R.D. 464, 467 (D. Mass. 2017) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)). "That is so because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id*. Therefore, the court should "probe behind the pleadings [and] formulate some prediction as to how specific issues will play out" in order to determine whether the proposed class satisfies Rule 23. *Raposo*, 293 F.R.D. at 54 (quoting *Motor Vehicles Canadian Exp. Antitrust Litig.*, 552 F.3d 6, 20 (1st Cir. 2008)).

## III.   THE LEGAL CLAIMS IN THIS CASE REQUIRE AN INDIVIDUALIZED ANALYSIS OF EACH PUTATIVE CLASS MEMBER'S "PRIMARY DUTY."

The Massachusetts Wage Act ("MWA") exempts "bona fide executive [and] administrative" employees from its overtime, Sunday pay, and Holiday pay provisions.  M.G.L. c. 151, § 1A(3); *see also* M.G.L. c. 136, § 16.  The MWA incorporates the exemption definitions from the Fair Labor Standards Act, and they should be interpreted consistently.  *See* 454 Mass. Code Regs. 27.03(3) ("The terms 'bona fide executive, or administrative' . . . in M.G.L. c. 151, § 1A(3) . . . shall have the same meaning as set forth in 29 CFR Part 541.").  In this case, Hannaford

contends that Plaintiff and each putative class member was, and remains, exempt per the MWA's executive and administrative exemptions or, alternatively, under the combination exemption. *See* 454 Mass. Code Regs. 27.03(3) (incorporating 29 C.F.R. §§ 541.100,[2] 541.200,[3] 541.708[4]).

These exemptions turn on each employee's "primary duty," which means "the principal, main, major or most important duty that the employee performs." *Id.* § 541.700(a). "Determination of an employee's primary duty must be based *on all the facts in a particular case*, with the major emphasis on the character of the employee's job as a whole." *Id.* (emphasis added). Factors to consider include "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.*

The "regulations make clear that these [exemption] questions must be resolved by examining the employee's *actual job characteristics and duties*." *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 504 (2d Cir. 2020) (emphasis added).[5] To that end, this analysis must be based

---

[2] The Executive Exemption is satisfied where (1) the employee is paid a salary not less than $684 per week ($455 per week prior to January 1, 2020); (2) the employee's primary duty is management; (3) the employee customarily and regularly directs the work of two or more other employees; and (4) the employee has the authority to hire or fire other employees or their suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. *See* 29 C.F.R. § 541.100(a).

[3] The Administrative Exemption is satisfied where (1) the employee receives at least $684 per week ($455 per week prior to January 1, 2020); (2) the employee's primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer; and (3) the employee's primary duty includes the exercise of discretion and independent judgment. *See* 29 C.F.R. § 541.200(a).

[4] The Combination Exemption is satisfied when "[e]mployees who perform a combination of exempt duties as set forth in the regulations . . . for executive [and] administrative . . . employees may qualify for exemption. Thus, for example, an employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption. In other words, work that is exempt under one section of this part will not defeat the exemption under any other section." 29 C.F.R. § 541.708.

[5] *See also Myers v. Hertz Corp.*, 624 F.3d 537, 548 (2d. Cir. 2010) (the "primary duty" analysis "requires examination of the duties that the employee actually performs"); *Patel v. Nike Retail Servs., Inc.*, No. 14-CV-04781-RS, 2016 WL 1241777, at *9 (N.D. Cal. Mar. 29, 2016) ("[T]he crucial touchtone when assessing a[n] exemption is the employee's actual job duties and responsibilities."); *Crowe v. Examworks, Inc.*, 136 F. Supp. 3d 16, 29 (D. Mass. 2015) ("[T]he regulations require a careful review of the job duties and responsibilities to determine whether the 'primary duty' test is satisfied.").

on "all the facts in the particular case," *DaRosa v. Speedway, LLC*, 557 F. Supp. 3d 315, 322 (D. Mass. 2021), and requires a "fact- and evidence-rich showing" of an employee's day-to-day job duties and responsibilities. *Rea v. Michaels Stores, Inc.,* No. SACV-13-455-GW, 2014 WL 1921754, at *4 (C.D. Cal. May 8, 2014).[6]   This individualized inquiry has left many courts "reluctant to certify class actions alleging misclassification," *Patton v. Dollar Tree Stores, Inc.*, No. CV-15-03813-MWF, 2017 WL 8233911, at *4 (C.D. Cal. Feb. 7, 2017), and courts have cautioned that "any dispute over how the employee actually spends his or her time, of course, has the potential to generate individual issues" that can "devolve into individual mini-trials regarding whether each particular class member [has] actually met the requirements for exempt status." *Rea*, 2014 WL 1921754, at *3.[7]   That is why courts insist that a plaintiff show "that . . . questions necessary to determining exemption can be answered with respect to the members of the class as a whole through generalized proof." *Scott*, 954 F.3d at 513  (quoting *Myers*, 624 F.3d at 548).[8]

As the federal courts have extensively held, the failure to provide such common evidence is fatal to certification, particularly in exemption cases like this one.[9]

---

[6] *See also Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 220 (D. Conn. 2003) (the "primary duty" analysis is "extremely individual and fact intensive"); *Grandy v. RWLS, LLC*, No. 17-588 JCH/CG, 2019 WL 1407214, at *8 (D.N.M. Mar. 28, 2019) (the "primary duty" analysis requires "fact-specific inquiries regarding each employee's specific job duties").

[7] *See also Patel*, 2016 WL 1241777, at *7 (noting that the exemption analysis "often militate[s] against certification because [it] typically require[s] an individualized, fact intensive inquiry").

[8] *See also Rea*, 2014 WL 1921754, at *4 (holding that the plaintiff must provide "common evidence" that will "diminish the need for individual inquiry"); *Faraji v. Target Corp.*, NO. 5:17-CV-00155-ODW-SP, 2018 WL 2041380, at *3 (C.D. Cal. Apr. 30, 2018) (certification should be denied in overtime misclassification cases "unless plaintiff proposes some form of common proof" showing "how employees spend their time at work").

[9] *See, e.g.*, *DaRosa*, 557 F. Supp. 3d at 322 (denying class certification where there was no "consistent answer to the question whether [store managers] were properly classified as exempt employees"); *Swank v. Wal-Mart Stores, Inc.*, No. 2:13-CV-1185, 2018 WL 2684102, at *5-6 (W.D. Pa. June 5, 2018) (same, as the court could not "extrapolate the primary duty of all [assistant managers] on a class-wide basis"); *Quiles v. Wal-Mart Stores, Inc.*, No. 16-9479, 2020 WL 1969940, at *6 (D.N.J. Apr. 24, 2020) (same, holding that the primary duty analysis was "fact intensive" and depended on the "actual work performed by the proposed class members"); *Rea*, 2014 WL 1921754, at *4 (same, for store managers, as determining whether they were exempt would "swamp the common issues of fact"); *Faraji*, 2018 WL 2041380, at *3 (same, as there was no uniform way to determine "how employees spend their work time"); *Chavez v. Lumber Liquidators, Inc.*, No. CV-09-4812 SC, 2012 WL 1004850, at *5 (N.D. Cal. Mar. 26, 2012) (same, "[a]s Plaintiffs have offered no common proof that Store Managers' job requirements are consistent [requiring] an individualized, and fact intensive analysis to determine how each Store Manager spends his or her time").

## IV.    SUMMARY OF THE EVIDENCE

### A.  Plaintiff's Class Includes Seven Different Manager-Level Positions.

Plaintiff's proposed class definition of "fresh department managers" actually encompasses seven different exempt, management-level positions: (i) Bakery Sales Manager, (ii) Deli Sales Manager, (iii) Deli/Bakery Sales Manager, (iv) Produce Sales Manager, (v) Meat Market Manager, (vi) Meat Market/Seafood Sales Manager, and (vii) Deli/Seafood Manager—*only one of which Plaintiff held*.  Ex. A at 5-6 (Def.'s Supp. Resp. to Pl.'s 1st Interrogatories.).  There are 116-plus putative class members across 15 different Hannaford grocery stores in Massachusetts.  *Id*. at 6.

Each of the seven positions covered by Plaintiff's class definition is a unique position and is separately responsible for managing a specific department or group of departments in a specific store.  *See* Decl. of Andrea Nickerson, Ex. B at ¶ 3.  No two departments within a store are the same.  Each department sells different products, has different levels of staffing, sales volume and customer demand, and has different food safety and other department-specific protocols.  *Id.* at ¶ 4.  These differences lead to different types of work being performed in each department.  *Id.* Given the differences, Hannaford has developed a host of corporate resources that are unique to each department and each department manager position.  For example, Hannaford has drafted specific written job descriptions for each department manager position, created different training aids for each department, and drafted unique operating procedures for each department based on the particularized work performed in that department.  *Id.* at ¶¶ 4-6, Ex. 1.

Though Hannaford has classified all seven positions as "exempt," Hannaford did *not* make a categorical exemption decision for all seven positions, as Plaintiff incorrectly asserts in her brief.  *See* Pl.'s Br. at 3.  Instead, Hannaford performed a position-by-position and store-by-store analysis for each position.  *See* Ex. A at 27-29.

**B.  Hannaford Expects its Department Mangers To Be Primarily Responsible for Managing Their Departments.**

Hannaford has clearly designed each of these seven positions to be exempt, manager-level positions.  As the job titles suggest and the job descriptions confirm, Hannaford expects each of these managerial positions to be primarily responsible for *managing* their respective departments. Ex. B at ¶ 3.  Indeed, all of the relevant corporate documents define these positions in terms of their exempt, department-management duties.  Whether it is the written job descriptions that emphasize department management-duties, or the manager-specific training materials that aid them in performing their managerial duties, or their own performance evaluations in which they and their supervisors evaluate their ability to manage their departments and their team, all of these resources continuously reinforce Hannaford's expectation that each of the seven positions is primarily responsible for managing their respective departments.  *Id*. at ¶¶ 4-6.

Hannaford's expectations have come through loud and clear—at least for several members of the putative class Plaintiff purports to represent. Per the attached, putative class members see themselves as the managers that Hannaford expects them to be, and they overwhelmingly describe their "primary duty" as managing their respective departments.  *See* Decl. of Lisa Pultar, Ex. F at ¶¶ 3, 5 ("My most important responsibility as the Bakery Sales Manager is managing my department"); Decl. of Mark Bernal, Ex. G at ¶ 3("As the Meat/Seafood Sales Manager, my primary responsibility is to manage the day-to-day operations in the my [sic] department."); Decl. of Steven Hebert, Ex. H at ¶ 3 ("My main responsibility as the Produce Sales Manager is to manage my department."); Decl. of William Gavazzi, Ex. I at ¶¶ 3-4 ("As the Deli and Bakery Sales Manager . . . my most important responsibility is managing the departments that I oversee.").

**C. Plaintiff's Own Claims Preview The Fact-Intensive Analysis Required For Each Putative Class Member.**

Plaintiff's deposition testimony (which, tellingly, she fails to cite in her motion) underscores the detailed nature of the "primary duty" analysis and provides a preview of the fact-intensive, individualized analysis that will be required for each putative class member.  Plaintiff testified for nearly seven hours in great detail about how she personally performed a wide-range of exempt duties when she was the Bakery Sales Manager at Hannaford's Middleboro, Massachusetts store.  Hannaford introduced over 70 exhibits—many of which showed Plaintiff managing her department in *real time*, including time-stamped email and text communications, electronically-stored records, and contemporaneous handwritten notes.  All of these documents were specific to Plaintiff, and *many of them were written by Plaintiff in her own words*, including her written statements in her own performance reviews, the written direction and feedback she provided to her subordinates, and countless text and e-mail messages that she sent—all describing and documenting Plaintiff performing her exempt, managerial duties on a daily basis.

Plaintiff's testimony was full of personal anecdotes from her time as the Bakery Sales Manager and provides a true sense of how she managed her "team"—a phrase she used throughout her deposition to describe the employees that she supervised.  Dep. of Judith Prinzo, Ex. C at 305. Though it is not possible to fully summarize in this brief the 350-plus pages of Plaintiff's detailed testimony, below are a few of the many duties Plaintiff testified to performing:

    (a)    **Interviewing and Hiring Associates**.  Plaintiff testified that she:

        (1) was responsible for hiring all of the hourly associates in her department (*id.* at 139:5-157:9);

        (2) personally interviewed each candidate and decided who to hire, and she explained in detail what she was looking for in particular candidates (*id.*); and

        (3) chronicled her hiring activities in numerous documents, including handwritten notes she took during interviews and e-mails and text messages in which Plaintiff accepted and rejected certain candidates (*id.*, Exs. 17-22).

    (b)    **Managing Staffing Levels**.  Plaintiff testified she was:

        (1) responsible for ensuring that her department was fully and appropriately staffed at all times, including anticipating the hiring needs for her department (*Id.* at 164:18-166:18); and

        (2) evaluated each year on how well she staffed her department and agreed with several positive comments from her store manager regarding how well Plaintiff anticipated those staffing needs (*id.*, Ex. 25) (Plaintiff's 2018 Annual Performance Review).

    (c)    **Mentoring Associates and Identifying High Performers.**  Plaintiff testified she:

        (1) was responsible for mentoring and developing associates, including identifying "high potential" associates for possible promotion (*id.* at 167:2-174:22, Ex. 26 (Plaintiff's 2017 Annual Performance Evaluation);

        (2) prepared career development plans for her associates (*id.*); and

        (3) played a "pivotal role" in grooming one of her former associates for promotion to a department manager role (*id.*).

    (d)    **Evaluating Associates.**  Plaintiff testified she:

        (1) prepared written evaluations for each associate in which she provided written comments and feedback, assigned them a numeric rating corresponding to their performance, and met with them to review the evaluation—which was ultimately used to determine which associates would receive a raise (*id.* at 177:1-195:11; Exs. 27-33 (a collection of sample performance evaluations prepared by Plaintiff)); and

        (2) completed formal 45-day and 90-day written evaluations for each of her new hires to determine whether they were a "good fit" at the end of the 90-day probationary period.  (*id.* at 197:21-202:4, Ex. 35-36 (two samples of new hire evaluations prepared by Plaintiff)).

    (e)    **Preparing and Revising The Weekly Work Schedule.**  Plaintiff testified she:

        (1) was responsible for preparing the weekly work schedule for her department, including scheduling herself and each of her subordinates each week (*id.* at 202:5-223:23);

        (2) used a computer software system (Kronos) to assist with the scheduling process, but she spent significant time each week editing the schedule to ensure that there was sufficient coverage and to ensure that the right mix of associates were working at the correct times (*id.* at 207:13-208:2); and

        (3) revised the schedule throughout the week based on associate availability, customer demand, and overall store conditions (*id.* at 224:23-228:17). Scheduling data from Kronos shows that Plaintiff made dozens of edits each week during the relevant time period (*id.* at 209:7-223:23, Ex. 37 (Plaintiff's Scheduling Edits)).

9

(f) **Managing Associates' Attendance.** Plaintiff testified she was responsible for managing her associates' attendance, including approving time-off requests, finding coverage when associates called out, and reviewing and approving their time cards each week. (*id.* at 242:22-251:9, Exs. 43-46 (a collection of "Supervisor Call-in Reports" drafted by Plaintiff documenting unplanned absences); Ex. 47 (sampling of text communications between Plaintiff and one of her associates regarding an unplanned absence)).

(g) **Training Associates.** Plaintiff testified she was:

(1) responsible for ensuring that all of her subordinates were adequately trained to perform their jobs, including confirming that associates had completed all required training "packets" to Plaintiff's satisfaction (*id.* at 251:14-259:8, Ex. 48-50 (sample "training packets" that Plaintiff reviewed and approved)); and

(2) evaluated each year on how well she trained her associates (*id.* at 261:10-263:7, Ex. 26 (Plaintiff's 2017 Annual Performance Evaluation)).

(h) **Managing Associates' Performance.** Plaintiff testified she was responsible for directing the work of her associates and ensuring that they performed their job duties correctly, including coaching associates and holding them accountable for poor performance (*id.* at 263:8-266:4, Ex. 53).

(i) **Disciplining Associates.** Plaintiff testified she:

(1) was responsible for initiating Hannaford's progressive discipline policy— starting first with a "verbal conversation" and escalating to formal, written warnings called "Coaching Memos" when associates did not improve (*id.* at 267:5-268:5); and

(2) authored dozens of these "Coaching Memos" for a range of disciplinary and performance issues (*id.*, Exs. 54-64 (a sampling of "Coaching Memos" and other records of Plaintiff "coaching" her associates)).

(j) **Managing Overall Profitability.** Plaintiff testified:

(1) she was responsible for managing the overall profitability of the Bakery Department at her store, including monitoring product inventory levels, reducing "shrink" or waste, and adequately managing her labor budget to achieve profitability (*id.* at 305:17-316:17); and

(2) the overall performance of the Bakery Department was a reflection of her ability to manage her Bakery Department (*see id.*).

(k) **Serving As "Manager On Duty."** Plaintiff testified she:

(1) served as the "Manager on Duty" ("MOD") from time to time, which involved Plaintiff "running" the entire store when the Store Manager and Assistant Store Manager were not on site (*id.* at 231:6-232:24); and

(2) served as the MOD for over 350 hours during the relevant time period (*id.*; *see* Ex. 40 (MOD hours)).

Though extensive, the exhibits introduced during Plaintiff's deposition testimony were by no means exhaustive and instead were just a sampling of the *hundreds of documents* produced during discovery that show Plaintiff performing her managerial duties on a day-in, day-out basis. Should Plaintiff's individual case proceed to trial, Hannaford would introduce *hundreds* of additional records and documents unique to Plaintiff's own work history and performance, and present testimony from Plaintiff's store managers, assistant store managers, and direct reports, and others who witnessed Plaintiff performing her exempt duties on a daily basis.

That is not all.  This type of individualized, document- and witness-intensive analysis would need to be repeated for *every single putative class member*—each of whom will have hundreds of their own individualized records, documents, testimony, and witnesses.

### D.  Plaintiff Has Not Offered Any Common Proof That Obviates A Plaintiff-By-Plaintiff Inquiry.

There is no substitute for the individualized inquiry outlined above.  Though Plaintiff urges that the class can be certified based on three pieces of "common evidence," this evidence is barely relevant to the primary duty analysis, much less proof that the entire class has been misclassified.

1. <u>Hannaford's training aids and standard practices are designed to help department managers—not dictate how department managers perform their job.</u>

Plaintiff first relies on various "standard practice training aids" and other documents to suggest that all putative class members perform the same "types of 'management' tasks" and "that they perform those tasks in the same way."  Pl's. Br. at 5-6.  Plaintiff takes these documents completely out of context.

Hannaford has developed these documents to help department managers manage their various departments—not to dictate how they should perform their jobs.  Ex. B at ¶ 6.  These various resources are designed to be tools to help department managers troubleshoot common issues.  *Id*.  But they are not intended to supplant each department manager's discretion about how

11

to run their departments, and none of these documents are designed to be an exhaustive list of all of the job duties that department managers perform on a daily basis. *Id*. at ¶¶ 5-6.

Take, for example, that "Hiring Toolkit" that Plaintiff cites as one of these "training aids." *See* Pl.'s Br. at 5, Ex. 6. The "Hiring Toolkit" merely provides department managers with suggested interview questions for hiring hourly associates. *Id*. It does not dictate when department managers should hire, who they should hire, or what qualities to look for in a candidate; those decisions are made by each individual department manager. *See* Ex. B at ¶ 6. Plaintiff, herself, described the "Hiring Toolkit" as a "template" and stated that she "often asked questions in addition" to the questions suggested in the "Hiring Toolkit." Ex. C at 149:23-151:3. Plaintiff testified about her hiring practices at length during her deposition and only mentioned the "Hiring Toolkit" once in passing. *Id*. at 139:5-157:9.

To the extent that Plaintiff now claims that these "training aids" limited her discretion as a department manager, several putative class members fundamentally disagree with that assertion:

- Lisa Pultar (Bakery Sales Manager): "These [] documents are tools and resources designed to help me. They do not dictate how I should manage my department. . . Hannaford has made a 'Hiring Toolkit' available to me, but I primarily use my own interview questions and interview style when hiring an associate for my department." Ex. F at ¶¶ 5, 8.

- Mark Bernal (Meat/Seafood Sales Manager): "I use [these documents] as resources for best practices, but they do not dictate how I manage my department. Instead, I use my decades of knowledge and experience to make decisions about how best to manage my department . . . I am not very familiar with Hannaford's 'Hiring Toolkit.' I have many years of experience as a department manager and know what questions to ask in each interview." Ex. G at ¶¶ 3, 7.

- Steven Hebert (Produce Sales Manager): "Hannaford has various standard practice documents and training aids which are helpful resources, but I prefer to rely on my experience when making decisions about how to manage my department. These training aids and documents do not dictate exactly how I should manage my department. It is ultimately up to me to decide how best to run my department . . . I don't rely on the Hiring Toolkit because I am an experienced manager and I know what questions I need to ask in order to find the best associates for my department." Ex. H at ¶¶ 4-5.

- <u>William Gavazzi (Deli/Bakery Sales Manager)</u>:  "No two departments are the same, and therefore I have to use my own discretion to decide how to manage each of the departments I oversee. . . I may reference the standard practice and training aids, but it is ultimately my decision how to effectively run my department and manage my associates. . . I primarily ask [interview] questions that I come up with on my own. I use the Hiring Toolkit as a resource for some interview questions, but I decide which questions I am going to ask and I tailor each question to the candidate and position."  Ex. I at ¶¶ 4, 8.

Clearly, the training aids cannot serve as the glue that holds this putative class together.

2.  <u>The "labor standards" cannot be used to determine the amount of time that department managers spend performing exempt vs. non-exempt tasks.</u>

Plaintiff's reliance on various "labor standards" is likewise misplaced.  *See* Pl.'s Br. at 4-6.  Hannaford has developed "labor standards" for certain tasks performed at the retail store level. Decl. of Jeremy Stevens, Ex. D at ¶ 4.  These "labor standards" identify tasks performed in each department and estimate the amount of time it takes to perform them.  *Id.* These "labor standards" are used by Hannaford to assess productivity and to forecast its labor needs.  *Id.* at ¶ 5.

Despite Plaintiff's efforts to reduce this case into a simple math problem, Hannaford's "labor standards" are not a proxy for how much time each of the "fresh department managers" actually spend performing exempt duties.  For starters, these "labor standards" are merely *estimates* of the amount of time it takes to complete various tasks—they do not conclusively establish the actual amount of time someone spends on any one task.  *Id.* at ¶ 5.  Even more to the point, these "labor standards" do not describe each of the seven department manager positions as a whole—nor are they designed to do so.  *Id.* at ¶ 6.  The "labor standards" do not say anything about *how* these managers perform the job, the relative *importance* of their duties, or account for the fact that department managers are *always* in charge of their departments even when they personally decide to perform non-exempt tasks.  *Id.*

Plaintiff's own "analysis" underscores these points.  Specifically, Plaintiff claims that a Bakery Sales Manager at Plaintiff's former store only spends 9.9 hours a week performing exempt

duties—arriving at this calculation by adding up all of the "labor standards" that are "assigned" to the Bakery Sales Manager position at that store.  *See* Pl.'s Br. at 6,  Ex. 13.  Though Plaintiff's math may be correct, her conclusion is not.

To start, Plaintiff's calculation assumes that the Bakery Sales Manager position only performs the 13 "tasks" in the "labor standards" spreadsheet.  Any suggestion that the Bakery Sales Manager is only responsible for performing 13 "tasks" each week is not grounded in the reality of the position and shows the immediate weakness in Plaintiff's "analysis."  Ex. D at ¶ 10.  But even taking Plaintiff's calculation at face value, the "labor standards" do not capture a significant amount of time that the Bakery Sales Manager spends performing exempt tasks each week, including the time that the Bakery Sales Manager spends being "Manager on Duty," training associates, or the time spent supervising and directing the work of his or her direct reports—just to name a few.  Indeed, reconstructing just one week of Plaintiff's own work history from the relevant time period shows that the "labor standards" do not account for nearly 30 hours that Plaintiff verifiably spent performing exempt managerial tasks that week.  *Id*. at ¶¶ 11-15.

Whatever conclusions that Plaintiff tries to draw from these "labor standards," the declarations from several putative class members make clear that the department manager role cannot be reduced to a number on a spreadsheet:

- <u>Lisa Pultar (Bakery Sales Manager)</u>:  "[The] Labor Standards do not fully reflect the true nature, extent, or scope of my managerial responsibilities and do not tell you what it takes to be a good manager. … The time it takes me to evaluate a situation and decide what to do in my department is not reflected in the Labor Standards."  Ex. F at ¶ 6.

- <u>Mark Bernal (Meat/Seafood Sales Manager)</u>:  "[The] Labor Standards do not accurately capture the time spent on all of the tasks performed in my department, or all of the tasks that I do as a manager . . . And, the Labor Standards cannot anticipate how much time I need to spend on managing the department." Ex. G at ¶ 6.

14

- Steven Hebert (Produce Sales Manager): "Hannaford's 'Labor Standards' provide rough estimates of how long certain tasks in my department will take to complete. . . The Labor Standards do not accurately reflect all of the time spent on certain tasks. And, [they] do not account for all of my time spent managing my department." Ex. H at ¶ 6.

- April Smith (Deli Sales Manager): "[T]hese Labor standards do not fully reflect the true scope of my managerial duties . . . And the Labor Standards cannot quantify all of the time I spend generally managing the department." Decl. of April Smith, Ex. J at ¶ 7

In other words, Plaintiff's allegations are either false, or her experience is completely different from the class she purports to represent. Either way, it is crystal clear that the "labor standards" do not answer the all-important "primary duty" question presented by Plaintiff's claim.

3.  The weekly scheduling process highlights the discretion each "fresh department manager" has to schedule their associates and themselves as they see fit.

Plaintiff makes a similar mistake when describing the weekly scheduling process. *See* Pl.'s Br. at 8-9. Though the scheduling software uses the underlying "labor standards" to recommend how many associates each manager should schedule each week, each manager has "the final say and responsibility for the schedule," including which, if any, tasks they assign to themselves. Dep. of Jeremy Stevens, Ex. E at 19:2-25; *see also* Ex. F at ¶ 9; Ex. G at ¶ 6; Ex. H at ¶ 6; Ex. I at ¶ 6; Ex. J at ¶ 6.

To that end, the "labor standards" do not dictate who should perform certain tasks and they say nothing about who actually performs those tasks—those decisions remain with each manager. Indeed, Plaintiff testified at length about how she edited the schedule each week to account for the "human elements" that the software cannot capture—including which associates were proficient at which tasks and which associates work well together. Ex. C at 202:5-223:23. Plaintiff's suggestion that the scheduling process was some sort of rote exercise ignores her own testimony and the scheduling records, which show that Plaintiff essentially rewrote the work schedule for her Bakery Department nearly every single week. *Id*. at 209:7-223:23, Ex. 37.

15

## V.    PLAINTIFF'S    PROPOSED    CLASS    DOES    NOT    SATISFY    THE REQUIREMENTS OF RULE 23(A)(2) OR (B)(3).

Under Rule 23(a)(2), Plaintiff must demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  The Supreme Court has cautioned, however, that this language is "easy to misread, since any competently crafted class complaint literally raises common questions." *Dukes*, 564 U.S. at 350.  "What matters to class certification is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation."  *Id*.; *see also Parent/Professional Advocacy League v. City of Springfield*, 934 F. 3d 13, 28 (1st Cir. 2019) (accord).  The commonality requirement is met only "where the questions that go to the heart of the elements of the cause of action will each be answered either 'yes' or 'no' for the entire class and the answers will not vary by individual class member." *Romulus*, 321 F.R.D. at 468 (quoting *Raposo*, 293 F.R.D. at 55).[10]

Rule 23(b)(3)'s "predominance" requirement is even "more rigorous" and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  This analysis "calls upon courts to give careful scrutiny to the relation between common and individual questions in a case," *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016), and "focuses on whether essential elements of the class's claims can be proven at trial with common, as opposed to individualized, evidence." *Taha v. City of Bucks*, 862 F.3d 292, 308 (3d Cir. 2017).  Ultimately, the court should assess: "(1) the elements of the claims and defenses to be litigated, (2) whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to

---

[10] *See also Walker v. Osterman Propane, LLC*, 411 F. Supp. 3d 100, 107 (D. Mass. 2019) ("[T]he class claims must depend upon a 'common contention' that is capable of class-wide resolution" in "'one stroke.'") (quoting *Dukes*, 564 U.S. at 350).

establish each class member's entitlement to relief, and (3) whether the common issues can profitably be tried on a class-wide basis, or whether they will be overwhelmed by individual issues." *Scott*, 954 F.3d at 512 (quoting *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015)).

Plaintiff's proposed class satisfies neither requirement.  The relevant question in this case—*i.e.*, whether Plaintiff and each of the putative class members are entitled to overtime—is "a complex, disputed issue, and its resolution turns on . . . whether plaintiffs fall within the Labor Department's criteria for [the executive or administrative exemptions]." *Scott*, 954 F.3d at 512-513 (quoting *Myers*, 624 F.3d at 548).  As noted above, the exemption analysis is "resolved by examining the employee's actual job characteristics and duties." *Id*.  Plaintiff does not disagree. Plaintiff readily acknowledges that this case turns on "what department managers do . . . [and] how long it takes them to do it," including the "relative importance of [the] tasks performed," "the amount of time spent performing different tasks," and their "level of supervision."  Pl.'s Br. at 15.

Plaintiff, however, has not offered any way to determine each putative class member's "primary duty" in "one-stroke." *Dukes*, 564 U.S. at 350.  The Court needs to look no further than the evidence related to Plaintiff's own individual claim to see the individualized analysis necessary to evaluate each putative class member's "primary duty"—including countless hours of testimony and hundreds of exhibits for each putative class member.  There is no short cut or end-run around this plaintiff-by-plaintiff inquiry.  Not only would Hannaford have the right to subject each putative class member to similar scrutiny, but Plaintiff has not offered any "common evidence" to answer the "primary duty" question for all putative class members without such an inquiry.

First and foremost, Plaintiff has no knowledge of how any other putative class member performed their job.  And as noted above, several putative class members directly dispute

Plaintiff's characterization of their position and offer a completely different account. Though the Court does not need to resolve this dispute now, it is clear that Plaintiff and the largely irrelevant "common evidence" she identifies cannot be the common thread that holds this class together.[11]

Second, Plaintiff's suggestion that Hannaford's decision to classify all of the putative class members as "exempt" is itself "common evidence" or some sort of admission that "uniform treatment is appropriate" is unfounded. Pl.'s Br. at 3, 14. Plaintiff incorrectly argues that Hannaford made a categorical classification decision for all seven positions when, in reality, Hannaford performed a position-by-position, store-by-store analysis. Regardless, courts have repeatedly held that common classification does not "obviate the need for individual inquiries into whether or not [that] classification [decision] was correct." *Benedict v. Hewlett-Packard Co.*, 314 F.R.D. 457, 476 (N.D. Cal. Apr. 8, 2016). Indeed, "[t]he fact that an employer classifies all or most of a particular class of employees as exempt does not eliminate the need to make a factual determination as to whether class members are actually performing similar duties." *Patton*, 2017 WL 8233911, at *5 (quoting *In re Wells Fargo Home Mortg. Overtime Pay Lit.*, 571 F.3d 953, 959 (9th Cir. 2009)).[12]

Third and finally, Plaintiff's remaining so-called "common evidence" is, at best, marginally relevant to the "primary duty" analysis, and certainly cannot take the place of a thorough, plaintiff-by-plaintiff inquiry. Whether Plaintiff relies on Hannaford's "training aids" or

---

[11] *See, e.g.*, *Gardner v. Western Beef Properties, Inc.*, NO. 07-CV-2345, 2011 WL 6140518, at *5 (E.D.N.Y. Sept. 26, 2011) ("These differing accounts are precisely the reason why individualized proof is necessary to determine if any particular employee was misclassified."); *Swank*, 2018 WL 2684102, at *6 ("Without a common narrative in the record as to what the [assistant store managers] did on a day-to-day basis, this Court cannot extrapolate the primary duty of all AMs . . . on a class-wide basis.").

[12] *See also Myers*, 624 F.3d at 549 ("[T]he existence of a blanket exemption policy, standing alone, is not itself determinative of the main concern in the predominance inquiry: the balance between individual and common issues."); *Morrison v. Ocean State Jobbers, Inc.*, 290 F.R.D. 347, 359 (D. Conn. 2013) ("Because the exemption determination does not address any individual plaintiff's actual duties, but rather the [employer's] perception of those duties en masse, the fact of common exemption does not establish whether all plaintiffs were actually entitled to overtime pay or whether they were covered by the applicable administrative regulations.").

18

the "labor standards," neither paints a complete and accurate picture of the job and neither answers the all-important "primary duty" question at the heart of Plaintiff's claim.

Hannaford's various "training aids" and other standard practices, for example, are merely guidance documents to help department managers successfully manage their departments—these documents do not dictate how department managers must manage their departments and certainly do not purport to fully capture all of tasks that department managers perform on a daily basis.[13]

The "labor standards" paint an equally incomplete picture.  Though Plaintiff tries to use these standards to reduce her claim into a simple math problem, the standards do not actually establish the amount of time that each department manager spends performing exempt duties. Indeed, Plaintiff's own "analysis" based on these "labor standards" is riddled with holes and fails to account for hours upon hours of exempt duties that Plaintiff actually performed each week.  *See* Ex. D at ¶¶ 10-15.

Even if the "labor standards" could be used to calculate the amount of time that Plaintiff or the putative class members spent performing exempt tasks, the case law makes clear that the "primary duty" analysis assesses the job "as a whole" and is more than just a simple counting game. *See Marzuq v. Cadete Enter., Inc.*, 807 F.3d 431, 436 (1st Cir. 2015) ("[A]n employee's 'primary' duty is not determined solely by the amount of time he or she devotes to the different categories of tasks—i.e., exempt vs. nonexempt—but on the overall character of his or her position."); 29 C.F.R. 541.700(b) ("Time alone, however, is not the sole test."); *Rooney v. Town of Groton*, 577 F. Supp. 2d 513, 526 (D. Mass. 2008) ("The determining factor of the primary duty

---

[13] *See, e.g.*, *Grandy*, 2019 WL 1407214, at *8 (rejecting the plaintiff's reliance on common "training programs" to try to establish each putative class member's "primary duty"); *Novak v. Home Depot, Inc.*, 259 F.R.D. 106, 109-110 (D.N.J. 2009) (rejecting plaintiff's argument that "standard operating procedures" could replace individualized inquiry).

is not the amount of time spent on a particular aspect of an employee's job.  Rather, the major emphasis in determining an employee's primary duty should be on the job as a whole.").

As the First Circuit has recognized in the retail context, a "manager who is in charge when on the job can still be managing even while physically doing something else and may have management as his primary duty even though he spends the majority of his time on non-exempt work." *Marzuq*, 807 F.3d at 439 (internal citations and quotations).  These "labor standards" do not even begin to attempt to account for these nuances.

Put simply, none of Plaintiff's "common evidence" generates a single, common answer to the "primary duty" question for any, much less all, of the seven positions and 116-plus class members.  Instead, if this case proceeds as a class action, the Court would be left to "pick the class apart, plaintiff by plaintiff, going into the day to day duties of each of the plaintiffs to [determine] that these [employees] are properly classified as exempt." *Burke v. Mgm't. & Training Corp.*, No. 3:16-CV-00152-NBB-JMV,  2018 WL 4038115, at *3 (N.D. Miss. Aug. 23, 2018).

## VI.    CONCLUSION

The "primary duty" analysis at the heart of this case turns on each putative class member's actual job duties and responsibilities and the nature, scope, and relative importance of those duties and responsibilities.  Plaintiff has failed to offer a way to perform that analysis on a class-wide basis for all putative class members. Though Plaintiff understands her obligation to provide "common evidence," and even attempts to offer some in her brief, none of Plaintiff's evidence answers the "primary duty" question and cannot replace a fulsome, plaintiff-by-plaintiff inquiry. The Court need not look any further than Plaintiff's own deposition testimony to see the long and winding road ahead.  Accordingly, Plaintiff's motion should be denied.

***

**DEFENDANT HANNAFORD BROS. CO., LLC,**

By its attorneys,

*/s/ Christopher M. Pardo*
Christopher M. Pardo (BBO# 674674)
  *cpardo@HuntonAK.com*
Elizabeth L. Sherwood (BBO# 687866)
  *esherwood@HuntonAK.com*
HUNTON ANDREWS KURTH LLP
60 State Street, Suite 2400
Boston, MA 02109
Tel: (617) 648-2800
Fax: (617) 433-5022

- and -

Ryan A. Glasgow (admitted *pro hac vice*)
  *rglasgow@HuntonAK.com*
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
Tel:  (804) 788-8791
Fax:  (804) 343-4897

Dated:  September 2, 2022

21

## <u>CERTIFICATE OF SERVICE</u>

I, Christopher M. Pardo, hereby certify that I served the foregoing on all counsel of record, through the Court's CM/ECF e-filing system on September 2, 2022.

<u>/s/ Christopher M. Pardo</u>

Christopher M. Pardo